Patricia **MARQUIS**, Annette Richmond, Erika Swain, Lisa Davis, Rhonda MacDonald, and Karin Conrad, Plaintiffs,

v.

**TECUMSEH PRODUCTS COMPANY,** Defendant.

No. 99–75971.

United States District Court, E.D. Michigan, Southern Division.

March 20, 2002.

Gerard V. Mantese, Troy, MI, Bruce A. Miller, Detroit, MI, for plaintiff.

David B. Bunsberg, Bloomfield Hills, MI, for defendant.

### *OPINION AND ORDER REGARDING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT*

ROSEN, District Judge.

## I. *INTRODUCTION*

Plaintiff Patricia Marquis, Annette Richmond, Erika Swain, Lisa Davis, Rhonda MacDonald, and Karin Conrad commenced this putative class action on December 13, 1999, asserting claims of hostile work environment sex discrimination and retaliation under Title VII of the federal Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and Michigan's Elliott–Larsen Civil Rights Act (the "Elliott–Larsen Act"), Mich. Comp. Laws § 37.2101 *et seq.*, as well as state-law claims of intentional infliction of emotional distress. Specifically, Plaintiffs, on behalf of themselves and their female co-workers at the Tecumseh Division plant of Defendant Tecumseh Products Company, allege that acts of sexual harassment are widespread, severe, and ongoing at Defendant's plant,

and that Defendant has adopted a common, plant-wide policy of refusing to take action against the discriminatory conduct of its employees, several of whom occupy management positions. This Court's subject matter jurisdiction is founded upon Plaintiffs' assertion of federal Title VII claims. *See* 28 U.S.C. §§ 1331, 1367(a).

By motion filed on December 1, 2000, Plaintiffs now request that the Court grant a hybrid class certification under Fed.R.Civ.P. 23(b)(2) and (b)(3), with common issues of liability and injunctive relief addressed under the former provision and claims for damages addressed under the latter. Defendant filed a brief in opposition to this motion on January 22, 2001, and Plaintiffs submitted a reply in further support of their motion on February 21, 2001. For its part, Defendant filed six (6) separate (and lengthy) motions on November 30, 2000, seeking summary judgment in its favor on all of the discrimination and retaliation claims asserted by each of the six named Plaintiffs. Plaintiffs filed a consolidated response in opposition to these motions on January 23, 2001, and Defendant submitted a consolidated reply in support of its motions on February 14, 2001. Finally, on December 26, 2000, Plaintiffs filed a motion requesting that the Court bifurcate any eventual trial into separate phases addressing liability and damages.

The Court conducted an extensive hearing on all of these pending motions on July 26, 2001. Remarkably, notwithstanding their prodigious submissions to date, counsel for the parties sought leave to file supplemental briefs addressing certain points raised at the July 26 hearing. Perhaps more remarkably, the Court granted this request, albeit sharply limiting the scope of these supplemental briefs to a "fallback" class certification proposal advanced by Plaintiffs at the hearing. Having considered the arguments of counsel at the July 26 hearing, and having reviewed the parties' voluminous briefs and exhibits and the record as a whole, the Court now is prepared to rule on the parties' motions.

This Opinion and Order sets forth the Court's rulings.

## II. *FACTUAL BACKGROUND*

### A. The Parties

Defendant Tecumseh Products Company is a multinational corporation that manufactures parts for refrigeration units, and employs approximately 8,500 workers at 18 different locations across the country. Defendant's Tecumseh Division is located in and around Tecumseh, Michigan, and this division's employees are spread over four different facilities in this area. One of these is the Compressor Facility, where Defendant's compressors are made.[1] This facility, in turn, is divided into five areas: Materials (Purchasing), Maintenance and Engineering, Controllers Area, Quality Assurance, and Production.

Plaintiffs Patricia Marquis, Annette Richmond, Erika Swain, Lisa Davis, Rhonda MacDonald and Karin Conrad all are current or former employees of Defendant's Tecumseh Division who, at one time or another, worked at the Compressor Facility. The claims asserted by the named Plaintiffs arose in the Production area, which is spread over 13 departments and rooms at the Compressor Facility. More specifically, the named Plaintiffs have complained of harassment in the white room, the high side, the oil line, the paper recycling crew, and the machine shop.

### B. The Claims Asserted by the Named Plaintiffs

As should be evident from the above recitation of the parties' many and lengthy submissions, the record before this Court is immense, and is replete with allegations and evidence of sexual harassment at Defendant's Tecumseh Division plant. The Court summarizes the principal claims and allegations of the named Plaintiffs here, with further details to follow below as necessary to the Court's analysis of the issues before it.

---

1. The record is not clear as to how many workers are employed in Defendant's Tecumseh Division, although Plaintiffs state in one of their briefs (without citation to any supporting evidence) that over 1,000 employees work at "the plant," apparently referring to the Compressor Facility.

## 1. Plaintiff Patricia Marquis

Patricia Marquis has been employed by Defendant since 1988. In March of 1993, following back surgery, she began working light duty jobs, reporting to Keith Keller. The first of these assignments was to clean the bathrooms, which she did until September of 1996.

Marquis's first complaint of sexual harassment arose in the summer of 1996, when she and Plaintiff Lisa Davis discovered a photograph of a naked man on their cleaning cart, along with a note stating, "If you like what you see leave an answer in an empty locker." The two women reported this incident to their union. They also went to Human Resources, and Marquis waited outside while Davis complained to John Dewey, the Director of Human Resources for the Tecumseh Division. Davis reported to Marquis that Dewey crumpled up the note and picture, stating that there was nothing he could do about it. The following morning, the women found another note and a letter, and then the activity ceased.

Soon thereafter, in September of 1996, Marquis was given the option of moving to second shift or being laid off, and she elected the layoff. Marquis alleges that this layoff was in retaliation for her report of sexual harassment in the summer of 1996. She returned to work in March of 1997, and was assigned to the paper recycling area. In this position, Marquis reported primarily to Keith Keller, although Kay Cagle also had managerial responsibilities over this area.

In paper recycling, Marquis generally worked with Bob Soto and two other employees. Soto also owned a limousine service and, according to Marquis, would occasionally ask Marquis to go for rides in the limo with him, and would also try to hug or kiss her. Although this conduct began before Marquis's layoff,[2] she testified that it got worse after she broke up with her boyfriend in May of 1997. From that point forward, according to Marquis, Soto would put his

arm around her several times a week, at one point touching her breast, and he invited her, on four or five occasions in the summer of 1997, to ride to Windsor, Ontario with him in his limousine.

Marquis testified that Soto's conduct went from joking to more severe in the 1997–98 time frame. For example, in the summer of 1998, Soto allegedly told Marquis that he wanted to take her to Windsor in his limo, put a red light on the vehicle, and make some money. Soto also asked Marquis when she was going to "give it up," and, in the fall of 1998, he bit her neck.

Marquis did not report the biting, touching, or kissing incidents to management. In 1997 or 1998, however, she complained to her supervisor, Keith Keller, that she was "sick and tired of [Soto's] mouth," and she demanded that Keller "do something with Bob or I[am] just going to have to kill him." (Marquis Dep. at 67–68.) In response, Keller reportedly asked "what did he do now," (*id.* at 68), and otherwise failed to take any action. Marquis further testified that Keller surely was aware of Soto's conduct, as he was present on a few occasions when Soto put his arm around her, and was only a few feet away on one occasion when Soto reportedly said to Keller, "[L]ook at the jugs on her," or words to that effect. (*Id.* at 286–87.) Keller allegedly said and did nothing upon witnessing these incidents. To the contrary, Marquis testified that, on one occasion, Keller appeared to be "still intoxicated from the night before," and told Marquis that she could "get a T-shirt that says, I work for head." (*Id.* at 304.)[3]

In the fall of 1998, Defendant hired an undercover private investigator to look into allegations of gambling in its Tecumseh plant. In one of his reports, the investigator advised Ike Growe, the Division Director of Human Resources, that he had witnessed Soto engaging in sexual conduct toward Marquis, including making overt sexual remarks, rubbing his groin against her leg, and strok-

---

2. For example, Marquis testified that Soto tried to kiss her once in 1995 and twice in 1996, but that she did not report these incidents.

3. Marquis testified that this remark "kind of shocked me," that Keller had never said anything else like this to her, and that she did not pursue the matter "because I knew [Keller] was still drunk" at the time. (*Id.* at 304–05.)

ing her breast. The investigator purportedly offered to be a witness if Marquis wished to file a complaint of harassment, but Marquis reportedly responded that it "wouldn't do any good," and that "[y]ou don't bite the hand that feeds you," which the investigator apparently took as a reference to Soto providing food to Keller and Keller failing to act on Marquis's earlier complaint. (*See* Defendant's Motion for Summary Judgment, Ex. 8.)

Upon reading the investigator's report, Growe began to look into the matter. On November 23, 1998, Growe called Marquis into his office, and she told him that Soto was "sometimes a pain," but that she could "handle things myself." (Marquis Dep. at 239.) Marquis has testified that she did not wish to pursue a formal complaint and did not want to see Soto lose his job, and that "I didn't want this to turn into a big mess," but that she simply wanted Soto to cease his conduct toward her. (*Id.* at 170–71, 239–40.) Growe purportedly told Marquis that he would speak to Soto and warn him.[4]

That same day, Growe called Soto into his office. Soto reportedly refused to cooperate, and Growe responded by suspending him pending further investigation. Although Growe assured Marquis that the matter would remain confidential, Soto was permitted to return to the plant to collect his belongings and advise his wife that he was leaving with their car. While in the plant,

Soto apparently went to the break room and told Marquis that he had been suspended, and generally went through the plant "shooting his mouth off" about what had happened. On November 30, 1998, Defendant and the union held a hearing on the charges against Soto. Soto purportedly admitted to several instances of sexual harassment toward Marquis, and was discharged as a result, effective November 23, 1998.

Marquis alleges that she was subjected to the silent treatment and stares · from co-workers, who were upset at her role in Soto's termination. She further alleges that, as a result of her complaint of sexual harassment, she was reassigned in January of 1999 to a computer input position in the Quality Control laboratory, suffering a pay decrease of 30 cents per hour. As other instances of alleged retaliation, Marquis asserts: (i) that, upon obtaining reassignment to a bathroom cleaning position in March of 2000 and discovering that the work aggravated her medical condition, she was denied a transfer to which she was entitled under the union contract; and (ii) that, following the commencement of this action, she overheard and was approached by co-workers regarding her role in bringing this suit.[5]

Finally, Marquis testified at her deposition regarding a few other instances of sexual harassment or inappropriate conduct. First, she testified about a "nasty picture" that was passed around her area in 1994, and was

---

**4.** Marquis testified at her deposition that some time later, in December of 1999, she was called into Growe's office for an update on the Soto matter, and Growe made an inappropriate remark, stating "something about, well, you never asked me out." (*Id.* at 169.)

**5.** Plaintiff Marquis and the other named Plaintiffs have submitted affidavits in support of Plaintiffs' consolidated response to Defendant's various motions for summary judgment. Yet, each of these individuals testified at length at her deposition about matters touching upon virtually every aspect of her employment with Defendant. As Defendant observes, "[a] party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts [her] earlier deposition testimony." *Rainbow Nails Enterprises, Inc. v. Maybelline, Inc.,* 93 F.Supp.2d 808, 833 (E.D.Mich. 2000) (quoting *Reid v. Sears, Roebuck & Co.,* 790 F.2d 453, 460 (6th Cir.1986)); *see also Penny v.*

*United Parcel Service,* 128 F.3d 408, 415 (6th Cir.1997) (declining to consider an affidavit where "a reasonable jury would know" that it could not be reconciled with the plaintiff's prior, detailed deposition testimony). Thus, to the extent that Plaintiffs' affidavits contradict their deposition testimony, or raise new allegations of harassment or retaliation that have never before appeared in their EEOC charges or elsewhere in the voluminous record in this case, the Court declines to consider them.

By way of example, the Court will not consider Plaintiff Marquis's statement in her affidavit that she was retaliated against in April of 1999 when she allegedly pinched a nerve in her neck during a temporary one-day assignment that purportedly did not comport with her medical restrictions. Marquis did not mention this instance of alleged retaliation in her deposition, despite ample opportunity to do so. In fact, she specifically testified that her neck pain had nothing to do with any claim in this case. (Marquis Dep. at 333.)

shown to her by a female co-worker. Next, she stated that a "nasty joke" had been left on the break room table in 1997. She further testified that, a "couple years ago," a co-worker nicknamed "Pork Chop" would "talk filthy" in the break room. Finally, she recounted an incident in early 2000, when a female co-worker showed her a copy of a sexually explicit cartoon involving the "Taco Bell" dog that reportedly had been posted on the window of the white room. Marquis did not report any of these incidents to management.

### 2. Plaintiff Annette Richmond

Annette Richmond began working for Defendant in 1993, and primarily was employed in the "high side" area. She alleges that her supervisor, Dave Soto, made inappropriate comments and engaged in improper conduct between 1993 and 1999. For example, Soto allegedly stated that he was in love with Richmond, and that he wanted to move in with her. Richmond testified at her deposition that she complained to other supervisors, Dave Johnson and Trina Higgins, regarding these comments, and that Higgins witnessed Soto making these comments. Richmond further testified that, over the last couple of years before she resigned in September of 1999, Soto occasionally would "come up behind me and feel my back or rub my back," and "would say I'm just seeing if you had a bra on." (Richmond Dep. at 109.) She asked Soto to cease this conduct, but did not report it to management because "it wouldn't have done any good." (*Id.*)

Richmond next contends that she was repeatedly sexually harassed by a supervisor in the welding department, Larry Carson. From 1993 until approximately 1997, Carson reportedly put his arms around Richmond on several occasions and made suggestive remarks. Richmond told him "[n]umerous times" to cease this behavior, but did not report these incidents to management. (*Id.* at 169, 172.)

Richmond also testified that she was sexually harassed by co-workers in 1996 and 1997. In 1996, co-worker Mike Whaley allegedly invited her to his house, and drew pictures of flowers and left them at her work station. Richmond complained to supervisor Dave Johnson, who allegedly "slap[ped] him on the hand and t[old] him to s[t]ay at his job and stay away from me," but Whaley continued to visit Richmond's work area. (*Id.* at 58–59.) Richmond also complained to John Dewey and Trina Higgins, and the conduct eventually ceased, perhaps in 1996 or 1997. Another co-worker, Larry Spiegel, posted sexually explicit pictures on his tool box from approximately 1997 until 1999. Richmond and a co-worker complained to a supervisor, but the pictures were not taken down.[6] A third co-worker, Bob Soto, allegedly stated on several occasions in 1997 that "I'll take you out in my limo, but you['ve] got to put out." (*Id.* at 180.) Richmond did not report this to her supervisors, but warned Soto to desist or she would tell his wife, who worked at the plant.

Next, Richmond testified that she was sexually harassed by Sam Faz in 1998 and 1999. Initially, when Faz was a co-worker, he purportedly posted a sexually explicit picture on the door of a cabinet where it was visible to other employees, and he made two sexual comments to Richmond. Subsequently, upon his promotion to supervisor, Faz allegedly would walk past Richmond and call her a "fucking bitch" or "white bitch" under his breath. (*Id.* at 114.) Richmond did not complain about this because Faz "was [a] supervisor." (*Id.*) At around the same time, in the summer of 1999, Richmond's supervisor, Ray Martinez, approached Richmond from behind on a couple of occasions and pinched her inner thigh. Richmond asked Martinez to stop, but did not complain to management, although she recalled that someone else reported Martinez for this same behavior directed at another woman.

Finally, Richmond testified that she began to experience sexual harassment from three co-workers in June of 1999. Following an incident in which Larry Spiegel and two of his friends stopped by Richmond's house un-

---

**6.** Richmond also testified that sexually explicit pictures occasionally were posted on a bulletin board in the high side area, and that supervisors regularly would walk past this board without removing the pictures.

invited and Richmond refused to let them in, Spiegel and two other co-workers, Tom Griffin and Richard Burciaga, began directing a series of inappropriate sexual remarks toward Richmond. Richmond first complained to Dave Soto, who reportedly "laughed it off." (*Id.* at 131.) Richmond then went to Trina Higgins, who referred her complaints to Ike Growe in Human Resources.

At a subsequent meeting with Growe and Higgins in July of 1999, Richmond stated that her co-workers had yelled obscenities and thrown things at her. According to Richmond, Growe first responded by inquiring about a co-worker that Richmond was dating, commenting on their difference in age and asking "does he give you money, is that why you go out with him?" (*Id.* at 139.) Later that day, when her co-workers learned that Richmond had complained about their conduct, they responded by stating that "somebody is going to get a vacation" and "there's going to be a bitch hanging ... this afternoon." (*Id.* at 146.) That same day, Richmond was given a five-day suspension; Defendant claims this was pre-determined discipline for excessive absenteeism, while Richmond charges that it was in retaliation for her complaint.

Soon thereafter, Richmond's three co-workers, Spiegel, Griffin, and Burciaga, were interviewed by Human Resources, and purportedly stated that Richmond had instigated the run-ins by making derogatory remarks about them and their families. Richmond then met with Growe, Higgins, and three union representatives, and was told that it was her word against that of her three co-workers. Thus, on August 25, 1999, all four employees were warned that they should cease their inappropriate conduct, and that any further violations would lead to discipline or discharge.

Richmond testified that, upon returning to her work station, her co-workers continued "running their mouths," and called her a "crybaby." (*Id.* at 156.) Then, within a few days, one of Richmond's co-workers threw a bolt at her and hit her in the side of the face,

cutting and bruising her. She reported this incident to her supervisor, Ray Martinez, who allegedly "just kind of sh[ook] his head a little bit, like no big deal." (*Id.* at 157.) Richmond took some of her accrued vacation time, and then resigned from her position with Defendant on September 22, 1999. Richmond alleges that she was constructively discharged; for its part, Defendant claims that Richmond applied for her subsequent, higher paying job in mid-June of 1999, before lodging her complaint about her co-workers, and that she accepted this position in early August of 1999, before Defendant's management had determined its response to Richmond's complaint.

### 3. Plaintiff Erika Swain

Erika Swain began working for Defendant in February of 1994. She alleges that her supervisor between 1994 and 1996, Larry Carson, made inappropriate comments to her on several occasions, such as "oh baby, what I could do to you." Even after Swain no longer worked for him, Carson allegedly would make such remarks to Swain when he saw her in the plant in 1998 and early 1999. Swain testified that she never asked Carson to stop making such comments and never filed a grievance against him, stating that "I was afraid to." (Swain Dep. at 221.) In a subsequent affidavit, however, Swain claimed that she finally confronted Carson in 1997, and that he then began to retaliate against her, finding problems with her performance for the first time.[7] Swain further testified that Carson's supervisor, superintendent Jesse Higgins,[8] made crude and offensive remarks to male employees in 1995 and 1997, and showed an offensive cartoon to a male employee in 1995.

Swain also has raised allegations of co-worker harassment. During the period when she worked for Larry Carson, she testified that her co-workers made various offensive and inappropriate comments. In addition, when she worked in a receptionist/switchboard position in 1997–98, she al-

---

7. It is not clear from the record, however, whether Carson still was Swain's supervisor in 1997.

8. Superintendents apparently have supervisory authorities over the first-level supervisors, or foremen, at Defendant's facility.

leges that she was the target of two inappropriate comments by co-worker Bob Soto. She further testified that co-worker Sam Faz made offensive remarks to her in 1994–95 and in 1996–97, and that, when she worked on the high-side line in 1998, she was subjected to mistreatment by a co-worker, Danny Alcorta, and to various offensive statements by co-workers, while supervisor Dave Soto stood by and took no action.

Next, Swain cites a variety of incidents arising from a 1997 videotape of her and co-worker Chris Stoddard having sex.[9] She allegedly first learned of the possible existence of this tape in the spring of 1997, when another co-worker asked her about it. Then, in late 1998 or early 1999, someone wrote the word "slut" on her work station, and Swain testified that she now believes this was related to the videotape.[10] Swain next heard about the tape in January of 1999, when co-worker Javier Faz mentioned it, and when an argument broke out between co-workers Juan Alcorta and Brian Swain (Erika's fiancé at the time, and now her husband) regarding this issue. Foreman Dave Soto investigated this incident, and then referred the matter to his supervisor, Trina Higgins, who advised Erika and Brian Swain that she had learned from another employee about the existence of the videotape. Higgins then asked the Swains if they wished to take the matter to Ike Growe in personnel, and they agreed to do so.

Upon learning of the incident, Growe promised to "get to the bottom of this," and he proceeded to interview several workers on the high-side line, cautioning them that they were not to talk about the matter and that "it was not to be an issue any longer after that day." (*Id.* at 154–57.) Growe's investigation revealed that, in the summer of 1998, Stoddard had brought the videotape to the plant and given it to superintendent Jesse Higgins, who took it home and viewed it.[11] Higgins then gave the videotape to Larry Carson, who also took the tape home and watched it. Growe purportedly advised these supervisors that they could be discharged for this conduct, and both apparently elected to resign before any official action could be taken.[12] Stoddard also was terminated, but this was changed to a resignation in a subsequent grievance proceeding.

In the days immediately following these incidents in January of 1999, Swain testified that a number of co-workers approached her to learn what had happened. In order to escape this environment, Swain asked Ike Growe if she could use some of her vacation time. Growe proposed, instead, that Swain be transferred to Defendant's Clinton facility, and Swain testified that she accepted this offer. Nevertheless, Swain now contends that she was forced out of the Tecumseh plant and into a lower paying job, as a result of Defendant's allegedly inadequate response to the videotape incident and its refusal to address the allegedly hostile work environment arising from this incident.

Further, Swain's complaints in this post–January–1999 time frame include: (i) that Chris Stoddard was permitted to return to the Tecumseh plant as a painting contractor, where Swain saw him on a number of occasions when she would pick up her husband Brian from the plant after work; (ii) that, in follow-up meetings in Ike Growe's office,

9. Swain testified that she was not aware that Stoddard was videotaping them, and she speculates that she was drunk and/or high on marijuana at the time the tape was made. For his part, Stoddard testified that Swain knew she was being taped, and that she told "all the guys in the welding department" about the tape shortly after it was made in 1997. (Stoddard Dep. at 8–9.)

10. According to Swain, foreman Dave Soto blacked out this word with a magic marker, and then cautioned the employees on the high-side that "this has got to stop" or someone would "get some time off." (*Id.* at 81.)

11. Stoddard testified that Higgins repeatedly asked him, in late 1997 and early 1998, to bring the tape into work and let him see it.

12. As Plaintiffs correctly point out, Defendant has not identified any record evidence in support of this version of the events leading to Carson's and Higgins's resignation. However, contrary to Plaintiffs' contention, Ike Growe did not testify—at least, not in the portions of the deposition transcript cited by Plaintiffs and provided to this Court—that Carson and Higgins left of their own free will, without pressure from Growe or anyone else.

Growe hugged her on a few occasions and made inappropriate personal remarks; (iii) that, during Growe's visit to the Clinton facility in March or April of 1999, Growe grabbed her chin and told her she was "so sexy"; and (iv) that, more recently, after this lawsuit was filed, the company denied her the opportunity to work overtime, and imposed unjustified disciplinary layoffs and suspensions for alleged absenteeism and allegedly failing to work mandatory overtime hours. Finally, Swain contends that she was constructively discharged in the spring of 2000, based on the emotional distress she suffered as a result of Defendant's retaliation against her for bringing this suit, and based on Growe's incorrect advice that the only avenue for taking time off to recover from this emotional distress was through the Family and Medical Leave Act ("FMLA").

### 4. Plaintiff Lisa Davis

Lisa Davis began working for Defendant in February of 1994. She worked in the white room until December of 1994, and alleges that she was harassed during this time by an unnamed co-worker, who whistled and hollered at her and asked her to go out with him. She brought this conduct to the attention of her supervisor, Mark Brooks, and she testified that it was "taken care of" to her satisfaction. (Davis Dep. at 99–100.)

In 1995 and the first half of 1996, Davis held a job cleaning bathrooms. She testified that, at some point during this time frame, co-worker Terry Blevins attempted to rape her, but that she "used my feet to get that fat sucker off me" and escape the situation. (Id. at 105–06.) Davis testified that she told John Dewey of Human Resources about this assault, and that he later advised her that Blevins had admitted to the incident and been warned to stay away from Davis.[13] Also during this time, Davis testified that co-worker Bob Soto made inappropriate comments to her, and that she reported these

comments to Keith Keller at one point, stating that "he needed to tell Bob to knock it off because one of these days he was going to be fired for sexual harassment." (Id. at 145.) Finally, and as noted earlier, Davis and co-Plaintiff Patricia Marquis claim that they were sexually harassed during this same time frame, in the spring of 1996, by an anonymous co-worker who left sexually explicit photos and notes on their cleaning cart.[14] Davis testified that she and Marquis complained to the union about this matter and that the conduct ceased, although Davis is unaware whether the union took any action.

The next incident involving Davis arose in late 1998,[15] when she allegedly was attacked by co-worker Jerry Burke. Davis testified that Burke asked to have sex with her, tried to grab her, and attempted to kiss her. Davis further stated that, for the next couple of days, Burke again would approach her and ask to have sex with her. Davis went to Bob Soto, and asked him to "tell your friend Jerry Burke to leave me alone; if he was going to bother me one more time, I was going to take him to the office for sexual harassment." (Id. at 167.) Davis testified that Burke "never bothered me after that." (Id.) Davis told a few co-workers about this incident, but did not report it to Human Resources, the union, or her supervisor, Bob Robinson.

Davis further alleges that, at some point in 1998 or 1999, an unidentified co-worker placed a sexually suggestive note on her hilo. She asked her supervisor, Dick Handley, to investigate the matter, but he apparently was unable to determine who had written the note. During this same time frame, and then again shortly after this suit was brought, a co-worker named Indio made a few inappropriate comments to Davis. She testified that she reported one of these remarks to Keith Keller, and another to Ike Growe, but that she does not know what action, if any, was

---

13. Dewey has denied that Davis ever made such a complaint to him.

14. Davis and Marquis offer slightly divergent testimony regarding this incident. For example, Marquis recalled only one photograph, while Davis testified that there were two.

15. In the interim, Davis worked in paper recycling for a few months in early 1998, alongside Patricia Marquis and Bob Soto, and in the white room for portions of 1997 and 1998, reporting to supervisor Dick Handley, all without experiencing any further incidents of sexual harassment.

taken. In addition, Davis, like Patricia Marquis, testified that an offensive cartoon featuring the Taco Bell dog was passed around the white room at some point, although Davis is not sure whether this occurred in 1997, 1998, or 1999.

Finally, Davis has raised two allegations of retaliation. First, she alleges that, in the fall of 2000, the company improperly denied her request for FMLA leave to breastfeed her baby in retaliation against her participation in this suit, although Defendant quickly corrected this acknowledged error and granted the requested leave, apparently even before Davis had returned to work at the end of her 12–week maternity leave. Next, she claims that supervisor Ben Spence retaliated against her in early 2000 by sending her home early on one occasion when her half of the line was shut down, rather than allowing her to remain and work the other half of the line as allegedly had been done in the past.

### 5. Plaintiff Rhonda MacDonald

Rhonda MacDonald began working for Defendant in February of 1994, and initially was assigned to work in the white room under foreman Jesse Higgins. MacDonald testified that, during the few months that she worked in this position, Higgins would yell and curse at her and criticize her job performance. MacDonald complained about this conduct to John Dewey in Human Resources, and Higgins was reprimanded and instructed to apologize to MacDonald in front of her co-workers. In addition, MacDonald was allowed to move to another position in the machine shop, supervised by Denny Richmond. MacDonald has no complaints during the period that she worked in the machine shop.

In late 1994 and 1995, MacDonald worked in the welding department. She alleges that supervisor Larry Carson sexually harassed her in this position, making sexual comments on a daily basis, putting his arm around her, and at one point offering MacDonald his paycheck if she would sleep with him. She further testified that two co-workers, Sam Faz and Dave Keith, also made sexual comments to her, and that Faz would grab himself in front of her and had pictures of nude women posted at his work station. MacDonald did not, however, report any of this conduct to management, although she believes she might have said something to Carson at one point about Faz's conduct.

From fall of 1995 until early 1997, MacDonald returned to the machine shop, this time supervised by Sam Davis. She had no complaints during this time period. She then worked in the white room through the spring of 1997, reporting to Dick Handley. MacDonald testified that, during this time, she was subjected to sexual jokes, crude remarks, and teasing by co-workers on a regular basis, and that her co-workers stuck notes on her back with sexual comments. MacDonald complained to Handley a couple of times, but she was not aware of any action taken on these complaints. She did not pursue these matters with the union or Human Resources, however.

In May of 1997, MacDonald took a pregnancy-related leave of absence, and then resigned to stay home with her child. In January of 1998, however, she reapplied for employment with Defendant, and was assigned back to the white room working for Dick Handley. She then bid into a job in the machine shop in August of 1998, where she was supervised by Ray Pizana.

Over the next several months, MacDonald's then-husband, Daryl MacDonald, bid into various jobs in the machine shop. MacDonald testified that she asked supervisor Ray Pizana and the union not to permit this, because the couple had separated, and she had obtained a protective order against her husband based on threats and violence toward her.[16] Nevertheless, Daryl MacDonald was permitted to bid into these jobs, and he then, on a daily basis, called his estranged wife such names as "whore" and "slut," occasionally accompanied by obscene gestures. When MacDonald complained about this conduct to Pizana, he reportedly said, "I don't want to hear your personal problems," told her he didn't care what Daryl

---

**16.** By its terms, this protective order did not prohibit Daryl MacDonald from working near his wife, but required that he not approach or confront her in public places.

was doing or saying, and instructed her to do her job. (MacDonald Dep. at 97.) [17]

In addition, Pizana apparently reported the couple's arguing to Keith Keller, who met individually with Rhonda and Daryl and stated that one of them would be removed from the department if the arguments continued. (*Id.* at 94–95.) MacDonald testified that she was "astounded" by this, and told Keller that Daryl was "the one doing all this to me." (*Id.* at 103–04.) Some time later, in the summer or fall of 1999, Keller received another report of arguing between Rhonda and Daryl MacDonald and again called Rhonda MacDonald into his office, reportedly stating that "he has got a situation here that is totally out of control and that he didn't know what to do about it," and that he would get together with Ike Growe to determine whether Rhonda or Daryl would be removed from the department. (*Id.* at 111.) MacDonald testified that she responded:

> Well, I'll tell you what, Keith. If you guys hadn't t[a]ken it into your own hands to go ahead and violate my protection order in the very beginning back when you did by allowing this psycho to bid on a job next to me, knowing full well he missed work because he was in jail for beating me up, if you hadn't let that happen in the very beginning, I said, I guess we wouldn't be sitting here right now, would we.

(*Id.*)

According to MacDonald, she was summoned to a meeting with Pizana and Keller a few days later, and asked whether she would agree to voluntarily leave the department. Pizana reportedly stated that, if Rhonda insisted on having Daryl removed from the department, the line would be "dead in the water," because "I don't have anybody else to run those grinders." (*Id.* at 114.) MacDonald refused to voluntarily leave her posi-

tion, and was told that the determination would be made on the basis of seniority. MacDonald testified that, a day or two later, she was told that she would be removed from the department because Daryl had more seniority.[18]

Sometime in the fall of 1999, MacDonald was removed from the machine shop and placed in the white room. She filed a grievance, and was reinstated to the machine shop in December of 1999, with the company advising her that she was not to engage in any further threatening behavior. After returning to the machine shop, MacDonald registered no further complaints about Daryl MacDonald's improper conduct, although she testified that it continued. She remained in this position until the line she was working on shut down in February of 2000, and then she moved to Defendant's Orbitec facility.

MacDonald testified that, while she worked at the Orbitec facility, she saw Daryl standing by the time clock at that facility on two occasions, and saw him numerous times sitting in the parking lot watching her leave work. She further stated that, on one occasion, Daryl drove past her slowly while giving her "the finger." She reported these incidents to Keith Keller, who then talked to Daryl and advised Rhonda that Daryl claimed to have innocent explanations for being at the Orbitec facility.

While at the Orbitec facility, MacDonald reported to supervisor Mark Jenkins. She testified that Jenkins made several inappropriate remarks to her in March of 2000. First, Jenkins reportedly told MacDonald "how easy it would be to get rid of people who are causing you problems," and "how easily you can poison a person." (*Id.* at 142.) He then said that MacDonald "would be really easy" to poison, because she ate "way too much food during the day and ... dr[a]nk

---

17. In addition, MacDonald testified that a co-worker, Dan Rinehart, and a supervisor, Joslyn Snook–Warner, witnessed Daryl's behavior toward her and reported these matters to management. Rinehart has stated, however, that he did not witness any arguing, name calling, or other misconduct involving Rhonda and Daryl MacDonald. In addition, Snook–Warner has stated that she only saw the couple arguing, and then advised Pizana about what she had seen.

18. Defendant contends, however, that MacDonald was removed from the department because of her repeated conflicts with her husband, her poor production, and because of an incident in which she allegedly confronted and threatened a co-worker, Theresa Nagy, for having told Daryl about an upcoming hearing in the MacDonalds' divorce proceedings at which the custody of the couple's children possibly would be determined.

too much bottled water." (*Id.* at 143–44.) MacDonald is unsure what Jenkins meant by these remarks,[19] but speculates that "he was fully aware of this lawsuit," and was perhaps "trying to tell me that somebody [might] consider doing that to me." (*Id.* at 144.) In any event, these comments made MacDonald fearful. A few days later, MacDonald reportedly had the following conversation with Jenkins:

> ... Mark c[a]me up to me and said, how are you doing today. I said I'm hanging in there. And he said, you look a little stressed. And I said, yeah. I said what's new. He says, well, Rhonda, I tell you what. This is what I'm going to recommend to you[,] what I recommend to anybody that is in your situation. He says you are under a lot of stress. It is not just you but everybody around you. I'm going to give you a great stress reliever. And he said—I'm thinking serious, that he is serious. Now he's going to tell me how to get rid of the stress.
>
> He says, tonight what I want you to do when you go home, kick back in your La-Z-Boy, put your feet up, get yourself all nice and comfortable, cozy. I want you to reach over to that stand next to you, pick up that gun, put it to your side of your head and pull the trigger.

(*Id.* at 150.) MacDonald believes that Jenkins was trying to scare her, and she links this remark to Jenkins' knowledge that she was participating in this lawsuit.

MacDonald did not report to work the next day, a Friday, and the following Monday she resigned, telling company officials it was for "personal reasons." (*Id.* at 155.) She now claims that she was constructively discharged following retaliatory threats against her life by her supervisor.

### 6. Plaintiff Karin Conrad

Karin Conrad has been employed by Defendant in an on-and-off basis since 1973. Her first report of sexual harassment dates

back to January of 1997,[20] when one of her co-workers imitated her by pretending to walk up a ramp in high heels while wiggling his buttocks. She reported this conduct to a union steward, who allegedly told her that her co-workers were "just having fun." (Conrad Dep. at 254.) Conrad also testified that, around this time, co-worker Sam Faz left her an orange with a sexually explicit note on it. After Conrad "told him off," Faz left her alone and eventually apologized. (*Id.* at 101.)

In February of 1997, Conrad began working for Trina Higgins on the high-side. She testified that Faz posted a picture of a naked woman on the inside of a cupboard near his work station, and left the doors open so that the picture was visible to her. Conrad also testified that she received a sexually explicit note from an unknown co-worker at around this time, but that she threw it away after reading the first line.

In early 1999, Conrad was bumped from her high-side job by an employee with more seniority, and assigned to paper recycling. She alleges that in February of 1999, supervisor Dave Soto made an inappropriate remark in the break room, where there was a strong fish smell coming from the microwave oven, stating that "it smells like you should go home and wash." (*Id.* at 92.) Conrad further testified that, while in recycling, co-worker Earl Pate frequently used the "f-word." At the urging of another co-worker, Conrad told Pate to "clean his mouth up," and Pate "tried" to do so afterward. (*Id.* at 35.)

Conrad's principal complaints in this case are directed at Ike Growe in Human Resources. First, she was told by a co-worker that Growe looked her "up and down" and "watch[ed] my butt" when she walked by. (*Id.* at 60–61.) Next, she testified that, in June of 1999, Growe commented several times about the color of her hair. According to a co-worker who was present at the time,

---

19. In particular, MacDonald testified that "I thought that [Jenkins] cared about his employees and I felt that he treated his employees well." (*Id.* at 145.)

20. Prior to this, she worked for approximately three years in the welding department, supervised by Larry Carson, but she testified that Carson never engaged in any inappropriate conduct toward her.

Sylvia Butler, Growe also touched Conrad's chin, but Conrad does not remember this. Conrad further testified that, on perhaps five occasions in the summer of 1999, Growe touched or squeezed her shoulder, and would leave his hand on her shoulder for several seconds while making small talk about her hair or other subjects. Finally, in October 1999, when Conrad was bent over a box, Growe allegedly put his hands on her shoulders and said "I'm going to throw you into the box," while pretending to do so. (*Id.* at 81–82.) Conrad further testified that Growe teased her about the incident the next day, stating "I hear somebody tried to throw you ... into a box yesterday." (*Id.* at 82.) Conrad did not report any of these incidents to management or file a grievance.[21]

In early 2000, Conrad complained to Keith Keller that recycling work hurt her shoulder, and she asked to be reassigned. Conrad was assigned to the Orbitec facility in January of 2000, initially reporting to supervisor Gene Clark. Conrad testified that, during the first couple of days in this department, Clark would suck his thumb in front of her, and Conrad took this as suggesting that she was a baby for participating in this lawsuit. Conrad also charges that Clark inappropriately disciplined her on one occasion, ordering her to return to her area and not to speak with other workers in the department.

In February of 2000, Conrad was reassigned to report to Mark Jenkins rather than Gene Clark. Conrad testified that she continued to experience retaliation and sexual harassment, however. First, she complains that she was not given a permanent pass key to the Orbitec facility, but instead had to renew a temporary pass each day.[22] Next, she alleges that supervisors have threatened to write her up for talking to co-workers. Finally, she testified about an incident in the spring of 2000 when a co-worker acted inappropriately by approaching her from behind

as she bent over,[23] and she stated that another co-worker, Gerald Jackson, yelled and swore a lot, although this conduct was not directed at her.

## III. *ANALYSIS*

### A. Plaintiffs' Motion for Class Certification

#### 1. The Standards Governing Plaintiffs' Motion

By motion filed on December 1, 2000, the six named Plaintiffs in this action request that the Court certify a class of current and former employees of Defendant "who have been the subject of harassment, discrimination[,] retaliation and a retaliatory hostile environment by Defendant Tecumseh's common discriminatory policies." (Plaintiffs' Second Supplemental and Amended Class Action Complaint at ¶ 97.) Plaintiffs seek to pursue both their state and federal discrimination and retaliation claims in this proposed class action. Plaintiffs' motion is governed by Federal Rule of Civil Procedure 23, which provides in relevant part:

(a) **Prerequisites to a Class Action.** One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

(b) **Class Actions Maintainable.** An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

\* \* \* \* \* \*

**21.** However, a co-worker submitted an anonymous letter dated September 7, 1999 to Defendant's Vice President of Industrial Relations, Wallace Stubbs, stating that Growe had been seen grabbing a woman employee, apparently Conrad.

**22.** Defendant contends that this arrangement was dictated by Conrad's status as an employee

assigned to the Orbitec facility only on a temporary basis. Conrad ultimately was given a permanent keycard on June 11, 2000, shortly after she was deposed in this action.

**23.** Conrad later told this co-worker that what he had done was rude, and the co-worker apologized and never again did anything that Conrad considered inappropriate.

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(3) the courts finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interests of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action. ·

Fed.R.Civ.P. 23.

■■■ As is clear from the text and structure of Rule 23 itself, a proposed class action must satisfy each of the four prerequisites of subsection (a), and must then qualify under at least one of the three categories set forth in subsection (b). *See In re American Medical Systems, Inc.*, 75 F.3d 1069, 1079 (6th Cir.1996); *Fuller v. Fruehauf Trailer Corp.*, 168 F.R.D. 588, 594 (E.D.Mich.1996). Plaintiffs, as the parties seeking class certification, bear the burden of establishing that these requirements are satisfied; "[a] class is not maintainable as a class action by virtue of its designation as such in the pleadings." *In re American Medical Systems*, 75 F.3d at 1079. Further, the Supreme Court has cautioned that "a Title VII class action, like any other class action, may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *General Telephone Co. v. Falcon*, 457 U.S. 147, 161, 102 S.Ct. 2364, 2372, 72 L.Ed.2d 740 (1982).

## 2. The Named Plaintiffs Failed to Fully and Properly Avail Themselves of Their Administrative Remedies, as Necessary to Sustain a Class Action under Title VII.

■■■ Before assessing Plaintiffs' request for class certification under the standards of Rule 23, the Court first must address a threshold procedural prerequisite to the commencement of a Title VII action, whether by an individual or on behalf of a class of aggrieved employees. Specifically, "[a] person who claims to have been discriminated against in violation of Title VII may not seek relief in federal court unless administrative remedies have first been exhausted." *Haithcock v. Frank*, 958 F.2d 671, 675 (6th Cir. 1992). This entails (1) filing a timely charge of employment discrimination with the Equal Employment Opportunity Commission ("EEOC"), and (2) receiving and acting upon the EEOC's statutory notice of the right to sue. *See* 42 U.S.C. §§ 2000e–5(e), (f); *Puckett v. Tennessee Eastman Co.*, 889 F.2d 1481, 1486 (6th Cir.1989). These two requirements, while not jurisdictional, are conditions precedent to bringing a Title VII action in federal court. *See Rivers v. Barberton Bd. of Education*, 143 F.3d 1029, 1031–32 (6th Cir. 1998). Exhaustion of administrative remedies is "intended to ensure that the [EEOC] will have been afforded an opportunity to attempt conciliation and voluntary settlement, the preferred means for resolving employment discrimination suits." *Parsons v. Yellow Freight Systems, Inc.*, 741 F.2d 871, 873 (6th Cir.1984) (internal quotations and citation omitted).

■■■ These same prerequisites apply to class actions brought under Title VII, albeit in a slightly relaxed form. In particular, while such devices as "piggybacking" and the "single-filing rule" might relieve individual class members of their obligation to file separate charges with the EEOC, a class action nevertheless must be supported by at least one representative charge, timely brought by one of the named plaintiffs, which adequately identifies the collective, class-wide nature of the claimed discrimination. *See, e.g., Grayson v. K Mart Corp.*, 79 F.3d 1086, 1102–05 (11th Cir.1996); *Schnellbaecher v. Baskin*

*Clothing Co.*, 887 F.2d 124, 127–28 (7th Cir. 1989); *Lusardi v. Lechner*, 855 F.2d 1062, 1077–78 (3d Cir.1988); *Hoffman v. R.I. Enterprises, Inc.*, 50 F.Supp.2d 393, 395–401 (M.D.Pa.1999). To qualify as representative, thereby satisfying the exhaustion of remedies precondition to the commencement of a Title VII class action, an EEOC charge must alert the employer and the EEOC of alleged class-wide discrimination, and must provide adequate notice of the scope of the proposed class, so that the parties may engage in meaningful conciliation efforts in advance of suit. *See Grayson*, 79 F.3d at 1104–05; *Tolliver v. Xerox Corp.*, 918 F.2d 1052, 1058–59 (2d Cir.1990); *Schnellbaecher*, 887 F.2d at 127–28; *Lusardi*, 855 F.2d at 1077–78.

■ Returning to the present case, the Court finds that Plaintiffs quickly confront a substantial hurdle in their effort to satisfy the exhaustion of remedies requirement. Only two of the named Plaintiffs, Patricia Marquis and Erika Swain, filed EEOC charges prior to the commencement of this action on December 13, 1999, and only one of these two, Marquis, had received notice of a right to sue as of this date.[24] Moreover, neither of these pre-litigation charges can possibly be construed as asserting class-based claims. Marquis's charge states, in its entirety:

I began employment with [Defendant] in December, 1989 as a Plant Worker.

In October 1996, I complained to the Human Resources Director about a picture of a naked man and sexually explicit letters. The H.R. Director laughed, threw away the picture and said nothing could be done. I was then unexpectedly laid off for six months because I opposed this sexual harassment.

I returned to work in March 1997. From that time un[ti]l November 1998, I was subjected to repeated, egregious, offensive and unwelcomed sexual advanced by my Group Leader, a male. He propositioned me for sex, grabbed my buttocks,

rubbed his groin on me, tried to kiss me and attempted to sexually attack me.

As a result of this harassment, the H.R. Director investigated the Group Leader and told him to stop. The Group Leader got belligerent with the H.R. Director and he was discharged. Since December 1998, I have been ridiculed by fellow employees for causing his discharge.

Also, I have been transferred to a more difficult job at less pay.

I believe that I was subjected to sexual harassment. Furthermore, I believe that I was retaliated against for opposing unlawful employment practices. This is in violation of Title VII of the Civil Rights Act of 1964.

(Defendant's Response, Ex. 108.) Swain's charge states, in its entirety:

I began employment with [Defendant] on February 7, 1994, and am currently employed as a Dock–Checker.

During January 1999, I was subjected to sexual remarks, jokes, and touching by supervisors and fellow employees. I complained to Human Resources and was subsequently moved to a different division with a decrease in pay.

I believe I was subjected to sexual harassment because of my sex, female, in violation of Title VII of the Civil Rights Act of 1964, as amended.

(Defendant's Response, Ex. 110). Plainly, neither of these charges provides any notice of alleged class-wide violations of Title VII, nor any suggestion of the scope of any proposed class of Title VII complainants. Thus, at the time Plaintiffs brought this suit, neither Defendant nor the EEOC could have found in the existing EEOC charges any indication of an alleged class-wide policy or practice of discrimination or retaliation.

Plaintiffs propose two ways around this dilemma. As noted earlier, the exhaustion of administrative remedies, including the re-

---

24. Specifically, Marquis filed her charge of discrimination on May 4, 1999, and notice of a right to sue was sent to her on September 14, 1999. Swain filed her charge of discrimination on October 26, 1999. On November 4, 1999, the EEOC sent the Michigan Department of Civil Rights a notice of its intention to dismiss Swain's charge, on the ground that it was untimely. On December 15, 1999, the EEOC provided Swain with a notice of her right to sue, issued at the request of her attorney (who is also Plaintiffs' counsel in this action).

ceipt of a right-to-sue letter, is not a jurisdictional requirement, but only a condition precedent to bringing a Title VII action. *See Rivers*, 143 F.3d at 1032. As a corollary to this principle, the courts have found that a failure to obtain a right-to-sue letter before bringing suit may be cured through the doctrine of "equitable modification," particularly where, as here, the plaintiff receives a right-to-sue letter within a short time after the Title VII action is brought. *See, e.g., Forehand v. Florida State Hosp.*, 89 F.3d 1562, 1567–70 (11th Cir.1996); *cf. Puckett*, 889 F.2d at 1486–88 (assuming, without deciding, that the doctrine of equitable modification is available, but declining to apply it in that case). Thus, Plaintiffs suggest that one or more of the four EEOC charges filed by the named Plaintiffs *after* the commencement of this suit can serve as the "representative charge" in support of a Title VII class action, where the EEOC apparently provided right-to-sue letters in response to these four charges soon after Plaintiffs filed their initial complaint.[25] Next, Plaintiffs invite the Court to overlook the "technicalities" of filing an EEOC charge and obtaining a right-to-sue letter before bringing suit, where the larger purposes behind the exhaustion of remedies requirement purportedly have been served here.

Neither of Plaintiffs' proposals suffices under the circumstances of this case. As an initial matter, the Court observes that Plaintiffs' appeal to their post-litigation EEOC filings would have far greater force if these charges—which, apparently, were prepared in consultation with Plaintiffs' counsel—expressly and unmistakably included class-wide allegations of discrimination or retaliation. In fact, the charges are somewhat lacking in this regard. One of them, filed by Plaintiff Rhonda MacDonald, asserts wholly individual claims, and includes absolutely no allegations that any co-workers have been subjected to any form of discrimination or retaliation. The remaining charges fail to identify any common or widespread corporate policy or practice under which employees have suffered class-based discrimination or retaliation. Rather, they simply allege that other co-workers, in addition to the complainant, have experienced instances of sexual harassment.[26] Some courts have questioned whether the mere mention of other employees who also have allegedly been victims of discrimination is sufficient to provide notice of class-based claims, where the relevant EEOC charges fail to identify any policies or practices applicable to a class of employees, or any issues in common across a class of potential complainants. *See Hoffman*, 50 F.Supp.2d at 400–01; *Kresefky v. Panasonic Communications & Systems Co.*, 169 F.R.D. 54, 59–60 (D.N.J.1996).

In any event, even assuming that the post-litigation EEOC charges in this case could be read as identifying, or at least suggesting, some form of class-wide discrimination, Plaintiffs still must provide some basis for relieving them of the obligation to bring such class-wide allegations to the attention of the EEOC and Defendant *before* filing this suit.

**25.** Specifically, while the dates on some of the relevant documents are not clear, it appears that Plaintiffs Lisa Davis, Rhonda MacDonald, Karin Conrad, and Annette Richmond all filed EEOC charges within a few days after this suit was brought on December 13, 1999. In addition, though the subsequent right-to-sue letters apparently are not in the voluminous record provided to the Court, Plaintiffs' First Amended Complaint, filed on January 12, 2000, affirmatively alleges that all of the Plaintiffs had received notices of their right to sue from the EEOC.

**26.** In particular, Plaintiff Lisa Davis's EEOC charge states (i) that "[s]ince 1995, I have been a victim to or have witnessed many sexual harassment encounters"; (ii) that "[m]any women have been victims of this behavior from men within the plant"; and (ii) that, "[v]ery recently, December 1999, I have complained to management about harassment from a co-worker" who "has had several complaints lodged against him, yet nothing has been done." Plaintiff Karin Conrad's EEOC charge alleges (i) that "[f]rom February 1999 and continuing, the Human Resource Director has subjected me and other women in the plant to sexual harassment in the form of unwelcome inappropriate touching"; and (ii) that "[o]ther supervisors have made comments that demean me as a woman, as well as other female employees." Finally, Plaintiff Annette Richmond's EEOC charge alleges (i) that one supervisor "ma[d]e sexual innuendoes towards me and other women, up through January *1999*"; and (ii) that "[a]nother supervisor would touch many women under his direction, including me, and make me uncomfortable," and that "[t]his occurred to me and other women constantly from 1999 forward."

Stated differently, it is Plaintiffs' burden to show why the Court should invoke the doctrine of equitable modification to cure their premature commencement of a Title VII class action. *See Forehand*, 89 F.3d at 1571. The outcome of this inquiry depends upon the extent to which Plaintiffs have frustrated the purposes behind the statutory precondition of exhaustion of administrative remedies.

It appears, on the face of it, that Plaintiffs' premature filing of this purported class action has wholly frustrated the principal purpose behind the exhaustion requirement—namely, "to ensure that the [EEOC] will have been afforded an opportunity to attempt conciliation and voluntary settlement, the preferred means for resolving employment discrimination suits." *Parsons*, 741 F.2d at 873. As of the date this suit was brought, only two charges had been filed with the EEOC, and neither of them provided even a suggestion of the need for class-wide investigation or conciliation. Moreover, Plaintiffs have failed to point to any evidence that the EEOC actually conducted any such class-wide investigation. In fact, the record suggests just the opposite, where (i) it appears that only the first of the six charges brought by the named Plaintiffs resulted in any sort of EEOC investigation; (ii) the second was promptly dismissed as untimely; (iii) the remaining four charges were filed only after this suit was brought; and (iv) right-to-sue letters evidently were issued within less than a month after these last four charges were filed. Although Plaintiffs should not be held accountable for any failure by the EEOC to properly investigate their claims, *see Forehand*, 89 F.3d at 1570–71, it nevertheless is their burden to show that they sought and cooperated in such an investigation, and that it was the EEOC which declined to pursue the matter. Plaintiffs have not provided any evidence that might support such a finding.

Instead, Plaintiffs offer two reasons why, in their view, they fulfilled the goals behind exhaustion of remedies. First, they argue that Defendant and the EEOC were provided with adequate and reasonably timely notice of class-based claims, thereby affording them a sufficient opportunity to investigate and seek a voluntary resolution of these claims on a class-wide basis. In support of this proposition, Plaintiffs point to the facts that (i) five of the six EEOC charges were filed at around the same time, and all six were filed within a few months; (ii) this case was filed as a putative class action while the last four of these charges still were pending before the EEOC; (iii) all six Plaintiffs had received right-to-sue letters by the time they filed their amended complaint on January 12, 2000; and (iv) after this suit was brought, some of the named Plaintiffs filed supplemental EEOC charges that specifically referenced this pending class action.

The common thread underlying all of this, however, is that Defendant was given notice of class-based claims only *after* this suit was brought. To be sure, any post-litigation EEOC filings potentially provide an opportunity for expanded administrative investigation and renewed attempts at conciliation and voluntary settlement. Yet, to hold that this opportunity, standing alone, is enough to satisfy the exhaustion requirement would be to utterly vitiate this requirement, because it always would be possible, in any case, to file some sort of post-litigation EEOC charge that, in theory, could provide another opportunity for administrative conciliation and settlement, notwithstanding the pending lawsuit. By requiring that this process generally must be exhausted *prior* to suit, Congress presumably recognized that the dynamics of conciliation and voluntary settlement are likely to change upon the commencement of litigation. *Cf. Kloos v. Carter–Day Co.*, 799 F.2d 397, 400–01 (8th Cir.1986) (reasoning that "employers might be expected to be more willing to participate in the conciliation process if they are aware of a potential class action"). In any event, regardless of what Congress might have anticipated, statutory requirements should not be so readily discarded, based solely upon a suggestion that the purposes behind them might be achieved through a different route.

Next, Plaintiffs endeavor to show that the EEOC had *actual* notice of class-based claims before this suit was brought. Specifically, they offer the affidavit of their counsel, Richard Mack, stating (i) that, in connection with Plaintiff Marquis's EEOC charge, he

informed the EEOC investigator in approximately July of 1999 "about two other women who have been subjected to sexual harassment and a hostile environment" at Defendant's plant; and (ii) that, in connection with Plaintiff Swain's EEOC charge, he informed the EEOC investigator in late October or early November of 1999 that "several other women wished to pursue claims of sexual harassment through the EEOC, and that if a right to sue letter was issued by the EEOC, we would be filing a lawsuit as a class action on behalf of all female employees at the plant." (Plaintiffs' Reply Br., Ex. 2, Mack Aff. at ¶¶ 2–3.) However, the first of these two statements is simply too vague to substitute for concrete allegations of class-wide discrimination, and the second can just as readily be construed as inviting the EEOC to promptly issue a right-to-sue letter as seeking a full-scale EEOC investigation of class-wide discrimination at Defendant's plant.

In any event, the Court declines to use the exhaustion requirement as a springboard to extensive litigation of what the EEOC knew and when it knew it. Rather, as the Seventh Circuit has stated, "it is not the scope of the actual investigation pursued that determines what complaint may be filed, but what EEOC investigation could reasonably be expected to grow from the original [charge]." *Schnell-baecher*, 887 F.2d at 128. Thus, "although the investigation may help define the scope of the charge, it is primarily the charge to which [the courts] look in determining whether the scope requirement is satisfied." 887 F.2d at 127; *see also Kloos*, 799 F.2d at 400 ("Allowing class actions without administrative charges that fairly anticipate class claims would undermine the notice and conciliation purposes of the filing requirement."). As noted, the two pre-litigation charges in this case could not reasonably be expected to have led to an investigation of class-wide discrimination. Nor do the "hints" of Plaintiffs' counsel as to "more to come" suffice to convey to the EEOC the need to conduct such a wide-ranging investigation. Finally,

nothing in the record suggests that the EEOC picked up this hint and actually conducted such an investigation. Consequently, in the absence of any evidence that Plaintiffs satisfied the statutory requirement of exhaustion of administrative remedies, or that the purposes behind this requirement otherwise were achieved in this case, the Court finds that Plaintiffs' failure to exhaust their administrative remedies before bringing suit, with respect to their class-based allegations of discrimination and retaliation,[27] precludes them from proceeding with a Title VII class action.

### 3. Plaintiffs Have Failed to Satisfy the Standards of Rule 23

Alternatively, even if Plaintiffs had exhausted their administrative remedies before commencing this putative class action, Defendant asserts that Plaintiffs have failed to meet their burden of establishing that class certification is warranted under Rule 23. The Court agrees.

As noted earlier, in order to satisfy the dictates of Rule 23, Plaintiffs must first establish the four prerequisites of subsection (a) of that Rule, and then must show that their proposed action qualifies under at least one of the three subdivisions of subsection (b). Beginning with the first of these inquiries, the four elements of Rule 23(a) "have been given the shorthand designations of 'numerosity, commonality, typicality, and adequacy of representation.'" *Fuller, supra*, 168 F.R.D. at 595 (citation omitted). As will soon become clear, Plaintiffs' showing as to at least three of these four elements is woefully inadequate.

#### (a) Numerosity

Turning first to numerosity, Rule 23(a) requires that the proposed class be "so numerous that joinder of all members is impracticable." There is "no strict numerical test for determining impracticability of joinder," *In re American Medical Systems, su-*

---

**27.** Although the same arguably could be said for the individual post-litigation charges filed by four of the six named Plaintiffs, Defendant has not argued that the claims of these four Plaintiffs are barred for failure to exhaust administrative remedies. Rather, by proceeding with full discovery, and then moving for summary judgment in its favor, Defendant evidently has expressed its preference for addressing these claims on the merits.

*pra,* 75 F.3d at 1079, and, as Plaintiffs point out, "classes with as few as twenty-five or thirty members have been certified by some courts," *Zeidman v. J. Ray McDermott & Co.,* 651 F.2d 1030, 1038 (5th Cir.1981). However, "[t]he mere allegation that the class is too numerous to make joinder practicable, by itself, is not sufficient to meet this prerequisite." *Fleming v. Travenol Laboratories, Inc.,* 707 F.2d 829, 833 (5th Cir.1983). Instead, "a plaintiff must ordinarily demonstrate some evidence or reasonable estimate of the number of purported class members." *Zeidman,* 651 F.2d at 1038. In general, the numerosity inquiry "requires examination of the specific facts of each case," *In re American Medical Systems, supra,* 75 F.3d at 1079 (internal quotations and citations omitted), and turns upon such factors as the dispersion of class members across a wide geographic area and the ease of identifying class members, *see Andrews v. Bechtel Power Corp.,* 780 F.2d 124, 131–32 (1st Cir.1985).

■ Initially, the Court observes that its task has been made considerably more difficult by Plaintiffs' utter failure to offer even an approximate definition or scope of the putative class they seek to represent. Their complaint suggests broadly, and rather unhelpfully, that they have brought this suit "on behalf of all other persons who have been the subject of harassment, discrimination[,] retaliation and a retaliatory hostile environment by Defendant Tecumseh's common discriminatory policies." (Second Suppl. and Amended Class Action Complaint at ¶ 97.) This statement, by its plain terms, is not limited to particular forms of harassment, discrimination, or retaliation, nor does it identify the "common discriminatory policies" that might unite the claims of the putative class. Moreover, Plaintiffs' present motion fails to supply many of the missing particulars; while it can safely be said that the putative class is made up primarily of alleged victims of the hostile work environment form of sexual harassment, there is no indication, for example, of any temporal limit to the class claims, nor whether the putative class members were employed at a particular facility, within one or more particular departments, in particular job classifications, or the like. Thus, the Court is not without sympa-

thy for Defendant's complaint that it has been placed "in the untenable position of guessing how Plaintiffs will define their class and then attacking the definition that it has guessed might be used." (Defendant's Response Br. at 3 n. 7.)

More specifically, turning to the issue of numerosity, Plaintiffs' entire analysis of this issue is as follows:

> Here, without question, the numerosity requirement is easily met. The class is sufficiently numerous to make joinder impracticable, if not impossible. Thus, the numerosity requirement is clearly satisfied.

(Plaintiffs' Motion, Br. in Support at 28.) Elsewhere, at the outset of their motion, Plaintiffs suggests that the putative class numbers in the "hundreds," (*id.* at 1), without in any way indicating how this estimate was derived. In short, the Court begs to differ with Plaintiffs' bald assertion that they have "clearly satisfied" the prerequisite of numerosity; it is equally clear to the Court that they have not met their burden on this element.

Nevertheless, in an effort to evaluate an argument that Plaintiffs have not made, the Court offers some tentative guesses as to the nature and scope of Plaintiffs' putative class. The Court assumes, for present purposes, that the "common policy" referenced in Plaintiffs' complaint derives from Defendant's allegedly systematic failure to properly address and take action on charges of sexual harassment. In this view, the putative class might consist of all female employees—perhaps employed in Defendant's Tecumseh Division, or in its Compressor Facility, or in some more limited area or department—whose complaints of sexual harassment were ignored or inadequately addressed by management, as well as, perhaps, those female employees who were sexually harassed, but who determined, in light of Defendant's alleged policy of neglect, that complaints would be futile. Even under these assumptions, the Court is no closer to resolving the numerosity inquiry, where Plaintiffs have not identified how long Defendant's purported policy has been in place,

how many complaints have been lodged during this time frame, or many other relevant figures—all of which seemingly are known, discoverable, or fairly readily estimable. Indeed, Plaintiffs have failed to supply even such basic information as the number of female employees in the Tecumseh Division and its various departments and subdivisions, much less offered any estimate as to how many of these employees might have been the target of hostile work environment sexual harassment.

The most directly relevant materials provided by Plaintiffs are a series of affidavits from some of Defendant's current and former employees, outlining incidents of sexual harassment they have experienced. By the Court's count, these affidavits identify 27 additional alleged victims of sexual harassment, in addition to the 6 named Plaintiffs. Assuming, then, that each of these affiants is a member of the putative class,[28] the class could be viewed as having at least 33 members. Yet, there is no way of knowing, and Plaintiffs fail to suggest a means for determining, whether this is only the "tip of the iceberg," or whether Plaintiffs' affidavits identify most or all of the members of the putative class. If the latter, a group of roughly 30 known individuals, all of whom are or were employed at a single facility, seemingly does not present insurmountable, or even "impracticable," issues of joinder. *See Garcia v. Gloor,* 618 F.2d 264, 267 (5th Cir.1980) (finding that the requirement of numerosity was not satisfied, where the putative class consisted of 31 individuals whose "identity and addresses were readily ascertainable," and who "lived in a compact geographical area"). Accordingly, the Court holds that Plaintiffs have failed to meet their burden of establishing numerosity under Rule 23(a).

**(b) Commonality**

Next, the "commonality" element of Rule 23(a) requires that there be "questions of law or fact common to the class." Complete identity of issues is not required; rather, it is enough if the resolution of one particular issue will affect all or a significant number of the members of the putative class. *Fuller,* 168 F.R.D. at 595–96. For example, "[w]here the party opposing the class has engaged in some course of conduct that affects a group of persons and gives rise to a cause of action, one or more of the elements of that cause of action will be common to all of the persons affected." 168 F.R.D. at 595 (internal quotations and citation omitted). Yet, "not every common question ... will suffice," because "at a sufficiently abstract level of generality, almost any set of claims can be said to display commonality." *Sprague v. General Motors Corp.,* 133 F.3d 388, 397 (6th Cir.1998). "What we are looking for is a common issue the resolution of which will advance the litigation." 133 F.3d at 397.

Once again, Plaintiffs' "showing" on this prerequisite is vague and highly conclusory:

Here, there are several common issues of law and fact. The most overriding common issues are the pattern or practice of unwelcome pervasive sexual harassment,

**28.** This assumption is likely to prove incorrect. The affidavits in question recount alleged incidents of sexual harassment occurring as long ago as the early 1980's, and as recently as this year. Yet, the courts have held that the backward and forward temporal scope of a federal employment discrimination class action is determined by reference to the date of the representative EEOC charge. *See, e.g., Hipp v. Liberty Nat'l Life Ins. Co.,* 252 F.3d 1208, 1219–25 (11th Cir.2001) (addressing the appropriate rearward and forward scope of a federal age discrimination class action). Thus, if, as discussed earlier, the representative EEOC charge in this case were deemed to be one of the charges filed in mid-December of 1999, shortly after this litigation was commenced, any claims based on incidents occurring more than 300 days before the filing of the representative charge—including many of the claims asserted by the named Plaintiffs—arguably would lie outside the rearward scope of the putative class action. *See Hipp,* 252 F.3d at 1220–21; *McDonald v. United Air Lines, Inc.,* 587 F.2d 357, 361 (7th Cir.1978). Moreover, as Defendant points out, many of the allegations set forth in Plaintiffs' affidavits lack any temporal point of reference, and putative class members "who cannot allege specific instances of discrimination within the relevant time frame cannot be counted toward computation of the class." *National Ass'n of Gov't Employees v. City Public Service Bd. of San Antonio,* 40 F.3d 698, 716 (5th Cir. 1994).

Tecumseh's policy of tolerating sexual harassment, and whether Tecumseh's purported policy on anti-harassment was "both reasonably designed and reasonably effectual." The central inquiry for this claim focuses on "the landscape of the total work environment rather than the subjective experience of each individual claimant."

(Plaintiffs' Motion, Br. in Support at 29–30 (citations omitted).)

■ This argument is noteworthy not just for its brevity, but for its mischaracterization of the governing law. Regarding the first "common issue" identified by Plaintiffs, and as discussed in greater detail below, it is *not* required that a plaintiff in a sexual harassment suit show that such harassment is "pervasive" throughout the workplace or part of a "pattern" of discrimination; rather, she need only establish that the conduct in question created a hostile work environment *for her. See Williams v. General Motors Corp.*, 187 F.3d 553, 560–61 (6th Cir.1999). To be sure, if Plaintiffs can demonstrate that Defendant's corporate policies led to a plant-wide hostile work environment for all female employees, then this showing will sustain most or all of their claims of sexual harassment. Yet, none of the named Plaintiffs need go so far to prevail on her own claims of unlawful discrimination.

Similarly, Defendant's purported tolerance of sexual harassment in the work place and the alleged ineffectiveness of its antidiscrimination policies are not necessarily common elements of all of the claims advanced by the named Plaintiffs. In particular, to the extent that Plaintiffs' claims rest upon the actions of supervisors, they need no longer show, under the most recent Supreme Court precedents, that the supervisor's harassing conduct was foreseeable, or that the employer failed to take corrective action; rather, it is the employer who must show, as an affirmative defense, that it took reasonable steps to prevent and correct any harassment by its supervisory employees. *See Williams*, 187 F.3d at 560–61. Once again, then, Plaintiffs have identified "common issues" that are not essential to at least some of their claims.

■ Nevertheless, the Court recognizes that common issues need not pervade the litigation, and that the commonality test "is qualitative rather than quantitative." *In re American Medical Systems*, 75 F.3d at 1080 (internal quotations and citation omitted). Thus, if the Court were to certify a putative class consisting of all female employees at Defendant's Compressor Facility who were subjected to co-worker sexual harassment within a given time period, there potentially would be a common issue as to whether Defendant "knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action." *Williams*, 187 F.3d at 561 (internal quotations and citations omitted). Even here, the outcome of this inquiry would not necessarily be the same as to all putative class members and their claims—after all, Defendant could be charged with knowledge of some incidents of harassment and not others, or could have adopted appropriate corrective measures in some cases and not others. Yet, if Plaintiffs' allegations prove true, Defendant's anti-harassment policies could be deemed so inadequate (or even non-existent), and its implementation of these policies so ineffectual, that one Plaintiff's showing on this issue would establish this necessary element of the claims of *every* class member, as least with regard to complaints of co-worker harassment. Plaintiffs' allegations and preliminary showing on this point persuade the Court that the requirement of commonality is present in this case.

### (c) Typicality

■ To satisfy the "typicality" prong of Rule 23(a), Plaintiffs must show that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." "The premise of the typicality requirement is simply stated: as goes the claim of the named plaintiff, so go the claims of the class." *Sprague*, 133 F.3d at 399. While the "commonality" and "typicality" inquiries overlap to a degree, this Court previously has explained that these prerequisites "focus[ ] on two distinct questions":

Under the commonality prong, a court must ask whether there are sufficient factual or legal questions *in common* among

the class members' claims to make class certification economical and otherwise appropriate. In contrast, under the typicality prong, a court must ask whether, despite the presence of common questions, each class member's claim involves so many *distinct* factual or legal questions as to make class certification inappropriate .... In short, commonality focuses on similarities, while typicality focuses on differences.

*Fuller,* 168 F.R.D. at 597–98.

 Plaintiffs' argument on this point has a familiar ring to it:

Here, the claims of the individual Plaintiffs are clearly typical of those of the class. The class representatives are victims of sexual harassment and a hostile work environment at Tecumseh's plant. Their claims of a pervasive hostile work environment at Tecumseh's plant and Tecumseh's failure to take measures to prevent sexual harassment are typical of those of the class. As such, Plaintiffs' theories of liability and theories of relief are identical to [those of] other class members. The proposed class representative[s] meet[ ] the typicality requirement of Fed.R.Civ.P. 23.

(Plaintiffs' Motion, Br. in Support at 31.) Apparently, then, under Plaintiffs' analysis, the very same issues are both common to and typical of the claims of the putative class members. Not content to identify merely a single or a few issues in common across all claims, Plaintiffs seemingly assert that all or nearly all of the same issues pervade the claims of the putative class members. Alternatively, Plaintiffs could be viewed as arguing, much more modestly, that the claims of the class representatives are typical only in their legal theories. Under this analysis, of course, any claim of sexual harassment asserted by any one of Defendant's employees would be "typical" of the sexual harassment claims advanced by any of her co-workers.

Regardless of what Plaintiffs might be arguing, the Court readily concludes that they have failed to meet their burden of establishing the typicality of their claims. Indeed, there are substantial differences even among the claims asserted by the named Plaintiffs.

Although there is a degree of overlap in these claims—for example, Marquis, Richmond and Swain all have complained about the conduct of co-worker Bob Soto; Richmond, Swain and MacDonald all claim that they were sexually harassed by supervisor Larry Carson; and Marquis, Richmond, Swain and Conrad all have made allegations of inappropriate statements or conduct by Human Resources Director Ike Growe—even these overlapping allegations often differ in their particulars, such as time frames, severity or pervasiveness of the conduct in question, and the employment relationship between the perpetrator and the victim. To cite one example, Marquis and Richmond mention only a single inappropriate remark by Growe, while Conrad alleges that Growe inappropriately touched her on several occasions over a period of months.

Upon reviewing Plaintiffs' affidavits of other putative class members, the Court discovers that their allegations share these same features with those of the named Plaintiffs—some "repeat players" (*e.g.,* Bob Soto, Sam Faz, Larry Carson, Jesse Higgins), but also some allegations that appear to be unique to that individual. For example, the affidavit of Sharon DeGroot makes allegations of sexual harassment by a co-worker identified only as "Tony" over portions of 1998, and more generally cites offensive statements and sexual signs placed on the backs of female employees over an unspecified period of time and in unidentified portions of the plant. As another example, the affidavit of Sally Hahn includes allegations of sexual harassment in the Housing Department by co-worker Claudio Sanchez in the 1994–98 time frame, but neither Sanchez nor, so far as the Court can tell, the Housing Department appears in the allegations of any other putative class member.

Moreover, turning to the alleged incidents of harassment that are the principal focus of the named Plaintiffs' claims, the Court is struck by the idiosyncracies and crucial questions of fact presented in each case. Patricia Marquis, for example, has acknowledged that much of co-worker Bob Soto's misconduct toward her went unreported to management, and that, when Ike Growe looked into the

matter, she advised him that she could "handle things myself," and that she did not wish to pursue a formal complaint. Regarding Annette Richmond's allegations of co-worker harassment in the summer of 1999, these co-workers claim that Richmond instigated the altercations by making disparaging remarks about them and their families. Similarly, Erika Swain's claim arising from the sexually explicit tape of her and co-worker Chris Stoddard will turn in part on whether she or someone else informed other employees of the existence of this tape, and the trier of fact also will be presented with evidence that senior management took prompt action upon learning that two supervisors had viewed the videotape. As discussed in detail below, there are questions of fact as to whether the harassment of Rhonda MacDonald by her estranged husband was attributable to considerations of sex or to personal animosity. In short, it appears from the record that each of the named Plaintiffs faces one or more significant obstacles in establishing her principal claim of sexual harassment, and that these claims, even among just the six named Plaintiffs, feature a wide variety of distinguishing circumstances.

By citing these differences, the Court does not mean to suggest that widespread and pervasive sexual harassment may evade the reach of a class action by virtue of the inevitable distinctions between one employee's experiences and another's. Rather, the point is that the claims and allegations of the named Plaintiffs here, by and large, rest upon discrete misconduct by identifiable bad actors, and not upon a general, pervasive atmosphere of offensive remarks or objectionable materials within a particular area or department. Thus, for example, Plaintiff Richmond might successfully show that she was sexually harassed by supervisor Larry Carson or Sam Faz, without in any way advancing the claims of those putative class members who allegedly were subjected to a more generalized hostile work environment by unnamed and unknown co-workers in an altogether different area of the plant. Alternatively, as another example, Plaintiff Conrad's claims involving Ike Growe might fail because she did not report these incidents to management or the union, or because Growe's con-

duct is found by the trier of fact to be insufficiently severe or pervasive to create a hostile work environment, yet this would in no way bear upon the determination whether other workers *were* subjected to a hostile work environment. At a minimum, it would be necessary to group the putative class members into several subclasses, taking into account such considerations as work area, job classification, and time frame, yet Plaintiffs have failed to propose any groupings that might satisfy the prerequisite of typicality.

In arguing that the claims of the named Plaintiffs are, in fact, typical of the class claims, Plaintiffs rely principally on the decision in *BreMiller v. Cleveland Psychiatric Institute*, 195 F.R.D. 1 (N.D.Ohio 2000). In that case, the named plaintiff, Susan BreMiller, cited a variety of alleged instances of sexual harassment by co-workers and supervisory personnel, culminating in an incident where a co-worker cornered her in a room, threatened to rape her, and pulled a gun on her. In rejecting the defendant's argument that BreMiller's claims were not typical of the class, both because her alleged injuries were "more severe than those of the other class members," and because she was "one of only two employees who reported the alleged incidents of sexual harassment against her to management," the Court stated:

> ... Plaintiff's claims and the claims of the class members are based on the same legal theory. Plaintiff, like her class members, alleges that she endured sexual harassment at CPI, that the CPI administration was unwilling to address such harassment, and that she experienced the same kinds of threats and retaliation that other class members have experienced. Consequently, the court finds that the typicality requirement of Rule 23(a)(3) is also satisfied.

*BreMiller*, 195 F.R.D. at 21–22.

With all due respect, and without venturing an opinion as to the correctness of *BreMiller's* ultimate conclusion, this Court does not find the above-quoted reasoning to be particularly helpful or instructive on the question of typicality. To hold, as *BreMiller* apparently does, and as Plaintiffs advocate

here, that claims are typical so long as they rest on the "same legal theory" would vitiate the requirement of typicality. Plainly, every individual who has raised allegations of sexual harassment in Defendant's plant would, if joined as a member of the putative class, be pursuing the "same legal theory." Yet, more is needed to satisfy Rule 23(a). As explained by the Supreme Court, "[i]f one allegation of specific discriminatory treatment were sufficient to support an across-the-board attack, every Title VII case would be a potential companywide class action." *Falcon, supra,* 457 U.S. at 159, 102 S.Ct. at 2371.

To be sure, Plaintiffs have attempted to bridge this gap between individual claims and an across-the-board attack by citing Defendant's allegedly chronic and repeated failures to take appropriate action in response to complaints of sexual harassment, and then arguing that this is tantamount to a policy or practice of permitting, or perhaps even encouraging, widespread sexual harassment at Defendant's facility. However, as observed earlier, each of the named Plaintiffs can succeed in most or all of her individual claims, and particularly in her principal claim, without establishing any such company- or plant-wide policy or practice—it is enough to show that each of them was the target of unlawful conduct, and that management failed to prevent, correct, or otherwise adequately address these particular incidents. Although the named Plaintiffs and their counsel might be willing to take on the additional burden of an across-the-board attack, it cannot be said that this is a necessary element of their claims, such that a victory for them will redound to the benefit of those class members who can make only more generalized claims of a hostile work environment. As in *Sprague,* "[a] named plaintiff who proved [her] own claim would not necessarily have proved anybody else's claim." *Sprague,* 133 F.3d at 399. In short, this is not ineluctably a case about a corporate policy or practice of discrimination.

Finally, on a more specific level, Defendant correctly points out that some of the named Plaintiffs confront statute of limitations problems that are not necessarily typical of the putative class. As noted earlier, the date of

filing of the representative class-based EEOC charge determines the temporal scope of a Title VII class action, and would largely limit the Title VII claims in this case to those arising after February of 1999. This might well mean, for example, that many of Plaintiff Marquis's Title VII claims are time-barred. Even the more generous three-year statute of limitations for claims under Michigan's Elliott–Larsen Act would pose a problem for some of the claims asserted by the named Plaintiffs. Such distinct defenses provide an additional basis for concluding that Plaintiffs have failed to establish the requirement of typicality. *See O'Neil v. Appel,* 165 F.R.D. 479, 492 (W.D.Mich.1996).

**(d) Adequacy of Representation**

■ The final prerequisite of Rule 23(a) is that "the representative parties will fairly and adequately protect the interests of the class." To satisfy this prong of the inquiry, it must be shown that the representatives have interests in common with, and not antagonistic to, the interests of the unnamed members of the class, and that the representatives will vigorously prosecute these interests through qualified counsel. *In re American Medical Systems,* 75 F.3d at 1083.

■ Once again, Plaintiffs offer only the conclusory statements that their counsel "is clearly well-qualified," with "extensive experience in litigation complex class actions," and that "there is no conflict of interest between the individual Plaintiffs and the members of the class," because "[t]heir claims are the same." Defendant, however, challenges both of these assertions. First, while Defendant has no quarrel with the ability of Plaintiffs' counsel to conduct class action litigation, it argues that counsel is laboring under a conflict of interest, where Plaintiffs have failed to assert any claims against their union, yet Plaintiffs' counsel, Bruce Miller, represents this union. In response, Plaintiffs state that there is no conflict, because Mr. Miller does not represent the local union. The Court is satisfied that Plaintiffs' choice of counsel is not a barrier to their satisfaction of the "adequacy" prong of Rule 23(a).

Next, Defendant points to alleged antagonism among the named Plaintiffs, and among the class representatives and the unnamed members of the class. As examples, Defendant cites the deposition testimony of Plaintiff Lisa Davis characterizing fellow Plaintiff Erika Swain as a "slut," and the affidavits of fellow employees charging that Plaintiff Annette Richmond referred to Mexicans as "spics" and African Americans as "niggers." Defendant also attacks the character of the named Plaintiffs, through allegations of drug use, drunk driving convictions, and the like. In light of its rulings on the other elements of Rule 23(a), the Court declines to referee this aspect of the parties' name calling and overall "battle of the affidavits."

Finally, and more substantively, Defendant cites cases holding that a class representative's susceptibility to unique defenses poses concerns of adequacy as well as typicality. *See, e.g., O'Neil,* 165 F.R.D. at 493 (observing that "[i]n this regard, the adequacy prong of Rule 23 overlaps with considerations of typicality"). As noted earlier, it does appear that some of the named Plaintiffs face substantial statute of limitations defenses to at least some of their claims. While this difficulty, standing alone, might not be sufficient to deny the class certification sought by Plaintiffs, the Court finds that it provides an additional basis for concluding that Plaintiffs have not satisfied the prerequisites of Rule 23(a). Accordingly, the Court declines to grant Plaintiffs' request to certify this suit as a class action under Rule 23.[29]

### 4. The Court Declines to Exercise Its Supplemental Jurisdiction over Plaintiffs' Proposed State–Law and Injunctive–Only Class Action.

■ Upon learning at the July 26, 2001 hearing of the Court's reluctance to certify a Title VII class action under the circumstances presented here, Plaintiffs' counsel proposed that a more limited class action be certified, involving only state-law claims of sexual harassment—thereby avoiding the exhaustion of remedies dilemma, which arises only under Title VII—and limited only to injunctive relief—thereby, in Plaintiffs' view, addressing some of the Court's concerns about the lack of typicality in the named Plaintiffs' claims. Following the July 26 hearing, the parties submitted supplemental briefs on this question, as well as replies to each other's supplemental briefs. Upon reviewing these submissions and conducting further research on the matter, the Court adheres to its above-stated conclusion that this case is not suitable for certification as a class action, even under the more limited terms now proposed by Plaintiffs.

First and foremost, Plaintiffs' proposal raises substantial—and, the Court concludes, insurmountable—jurisdictional concerns. Under this proposal, the six named Plaintiffs would go forward with their individual Title VII claims, and the class action would involve only state-law claims under Michigan's Elliott–Larsen Act, and would address only the question whether Defendant's sexual harassment policy for hourly workers during the relevant time frame was inadequate to satisfy its obligation under state law to take prompt remedial action upon learning of such harassment. While Plaintiffs' supplemental submissions again, and somewhat maddeningly, fail to suggest the precise contours of the proposed class, it is at least evident that Plaintiffs' request for certification, if granted, would result in a handful of individual federal Title VII claims serving as the federal-question jurisdictional anchor for the Court's consideration of the supplemental state-law claims of a much larger class of Defendant's hourly employees.

Accordingly, Plaintiffs' proposed state-law class action implicates questions of so-called "pendent-party" jurisdiction—that is, "jurisdiction over parties not named in any claim that is independently cognizable by the fed-

---

**29.** In light of this ruling, the Court need not reach the inquiry called for under Rule 23(b), and need not confront the difficult issue concerning the effect of the 1991 amendments to Title VII—and, specifically, the availability of compensatory and punitive damage awards—upon the prior, fairly typical judicial practice of certifying employment discrimination class actions under Rule 23(b)(2). *See, e.g., Lemon v. International Union of Operating Engineers, Local No. 139, AFL–CIO,* 216 F.3d 577, 580–82 (7th Cir.2000); *Allison v. Citgo Petroleum Corp.,* 151 F.3d 402 (5th Cir.1998).

eral court." *Finley v. United States,* 490 U.S. 545, 549, 109 S.Ct. 2003, 2006–07, 104 L.Ed.2d 593 (1989). While *Finley* held that the exercise of pendent-party jurisdiction exceeded the statutory authority of the federal courts, Congress has since provided the requisite authority in 28 U.S.C. § 1367(a), which, among other things, confers supplemental jurisdiction over "claims that involve the joinder or intervention of additional parties." Thus, it appears that there is no *per se* bar to this Court's exercise of supplemental jurisdiction over a state-law class action, so long as the state-law claims are "so related to claims in the action within [the Court's federal question] jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).[30] The Court cannot conclude, and Defendant does not contend, that the claims to be litigated in Plaintiffs' proposed state-law class action are so unrelated to the named Plaintiffs' federal Title VII claims as to fail to satisfy the broad "same case or controversy" requirement of § 1367(a).

Nevertheless, the Court's inquiry is not at an end, because § 1367(c) confers a significant degree of discretion upon the exercise of supplemental jurisdiction. As one commentator has observed:

> Subdivision (c) of § 1367 sets forth the grounds upon which the court "may decline to exercise supplemental jurisdiction over a claim under subsection (a)." The operative word is "may", importing its usual broad degree of discretion, so that there may be a temptation to conclude that what Congress has given with one hand—under subdivision (a) the court "shall have" supplemental jurisdiction—it has taken away with the other, or permitted the judges to take away with the "may decline" language of subdivision (c). But the decline must be based on one of the four numbered grounds set forth in subdivision (c).

David D. Siegel, "Practice Commentary: The 1990 Adoption of § 1367, Codifying 'Supplemental' Jurisdiction," 28 U.S.C.A. § 1367 commentary (West 1993). The state-law claims to be adjudicated in Plaintiffs' proposed class action arguably implicate three of the four grounds set forth in § 1367(c)—*i.e.,* these claims might "raise[ ] a novel or complex issue of State law," they might "substantially predominate[ ] over" the individual Title VII claims, or they might present "exceptional circumstances" which give rise to "other compelling reasons for declining jurisdiction."

There is a paucity of case law addressing situations like the one now confronting the Court, where the exercise of supplemental jurisdiction over a state-law class action—involving, according to Plaintiffs, "hundreds" of class members, (Plaintiffs' Suppl. Br. at 20)—would be anchored to a few individual federal claims. In terms of sheer numbers of cases, Defendant occupies the stronger position, as all but one of the handful of courts that have considered this or an analogous issue have declined to certify a state-law-only class action. *See Hatfield v. Oak Hill Banks,* 115 F.Supp.2d 893, 898 (S.D.Ohio 2000); *Ruffu v. Johnson & Johnson, Inc.,* 181 F.R.D. 341, 344 (E.D.Tex.1998); *Zelaya v. J.M. Macias, Inc.,* 999 F.Supp. 778, 782–83 (E.D.N.C.1998); *Ruiz v. Stewart Assocs., Inc.,* 167 F.R.D. 402, 406 n. 10 (N.D.Ill.1996); *Martin v. Dahlberg, Inc.,* 156 F.R.D. 207, 218 (N.D.Cal.1994). *But see Ansoumana v. Gristede's Operating Corp.,* 201 F.R.D. 81, 89–96 (S.D.N.Y.2001).

Moreover, the Court finds that the cases which support Defendant's position are more persuasive, and involve more directly analogous circumstances, than the lone case cited by Plaintiffs to the contrary. In *Martin,* for example, the plaintiff consumers asserted federal RICO and state-law fraud, misrepresentation, and negligence claims against the defendant hearing aid manufacturer, and sought class certification for both their federal and state-law claims. The Court declined to certify a class with respect to the RICO

---

**30.** The standard for "relatedness" was defined by the Supreme Court in *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966), and requires that federal and state claims "derive from a common nucleus of operative fact." *See also Salei v. Boardwalk Regency Corp.,* 913 F.Supp. 993, 998–1000 (E.D.Mich.1996) (discussing and applying the *Gibbs* standard).

claims, finding that the plaintiffs' claims "present[ed] highly individualized questions of reliance which predominate in these proceedings." *Martin*, 156 F.R.D. at 217. In light of this ruling, the Court then elected not to exercise its supplemental jurisdiction to certify a class with respect to the state-law claims:

> Section 1367(c)(2) provides that the Court may decline to exercise supplemental jurisdiction over a claim if "the claim substantially predominates over the claim or claims over which the district court has original jurisdiction." The RICO claims of the four individual plaintiffs are insignificant compared with the class-wide relief potentially available to plaintiffs under the [California] consumer protection laws. This is precisely the type of case where the Court should decline to extend federal judicial power.

*Martin*, 156 F.R.D. at 218; *see also Ruiz*, 167 F.R.D. at 406 n. 10 (declining to certify a class with respect to the plaintiffs' federal RICO claims, and then holding that the state-law claims of the putative class "would substantially predominate over" the federal claims of the two individual plaintiffs); *Ruffu*, 181 F.R.D. at 344 (following *Martin*, and declining to certify a state-law class action where the plaintiffs' federal RICO claims were found inappropriate for class certification).

Under the similar circumstances presented here, this Court also finds that Plaintiffs' state-law claims, if pursued on a class-wide basis, would substantially predominate over the individual Title VII claims of the named Plaintiffs. First, it is clear that these state-law claims would predominate in a purely numerical sense—should Plaintiffs prevail, the universe of employees to whom relief would be awarded would be far larger than the group of six individuals who seek to recover under Title VII. Moreover, as discussed earlier, Plaintiffs confront a far greater evidentiary hurdle to establish a systematic, across-the-board defect in Defendant's sexual harassment policy than would be required to show, as an element of each of their individual claims, that this policy proved inadequate to address their particular situa-

tions. Thus, the proofs involved in Plaintiffs' proposed state-law class action would substantially predominate over the far more limited pool of evidence implicated in the individual Plaintiffs' Title VII claims.

Indeed, as discussed in greater detail below, there is a significant disjunction in the legal standards governing Plaintiffs' federal and state-law claims. If the law under Title VII and Michigan's Elliott–Larsen Act were substantially the same, it could then at least be said that the legal issues presented in a state-law class action would complement, rather than predominate over, the issues to be resolved under the individual Plaintiffs' Title VII claims. Yet, to the extent that the named Plaintiffs are alleging harassment by a supervisor (as several of them are), the issue to be addressed in the proposed state-law class action—namely, the efficacy of Defendant's sexual harassment policy, with its resulting exposure to *respondeat superior* liability for the unlawful conduct of its employees if this policy is shown to be ineffective—is not even an element of Plaintiffs' Title VII claims, but instead comes into play, if at all, as part of an affirmative defense that Defendant must establish in order to escape liability. *Compare Williams, supra*, 187 F.3d at 560–61 (setting forth the governing law under Title VII), *with Chambers v. Trettco, Inc.*, 463 Mich. 297, 614 N.W.2d 910, 915–18 (2000) (describing the different standards that apply under Michigan law). In short, on the legal as well as the factual level, Plaintiffs' proposed state-law class action, even though limited to a single issue and seeking only injunctive relief, would require a considerably more far-reaching inquiry than is needed to resolve the individual Title VII claims of the named plaintiffs. Consequently, the Court exercises its discretion under § 1367(c)(2) to decline to exercise supplemental jurisdiction over the class-based state-law claims advanced by Plaintiffs.

Further, the Court finds that this case presents "exceptional circumstances," 28 U.S.C. § 1367(c)(4), that militate against a broad exercise of supplemental jurisdiction over the state-law claims of the putative class. First, while supplemental jurisdiction generally is thought to advance the goal of

judicial economy, *see, e.g., Gibbs,* 383 U.S. at 726, 86 S.Ct. at 1139, Defendant correctly points out that Plaintiffs' proposed state-law class action, addressing only one of the five elements of a hostile work environment claim under Michigan's Elliott–Larsen Act, will in no way obviate the need for each alleged victim of sexual harassment at Defendant's Compressor Facility to bring her own state-court suit, and to prove the remaining four elements of her claim, in order to recover damages. In contrast, if a state-law class action were not certified, the individual Plaintiffs still would be able to pursue injunctive relief that might well redound to the benefit of their co-workers, even though they are not parties to this action. *See* Mich. Comp. Laws 37.2801(1) (authorizing awards of injunctive relief under the Elliott–Larsen Act); *see also Whitman v. Mercy–Memorial Hosp.,* 128 Mich.App. 155, 339 N.W.2d 730 (1983) (striking down the defendant's policy as violative of the Michigan statute). Plaintiffs' counsel conceded this very point at the July 26 hearing. (*See* 7/26/01 Hearing Tr. at 17–18.) In short, there is little (if anything) to be gained, in terms of judicial economy, through certification of the state-law injunctive-only class action proposed by Plaintiffs; to the contrary, class certification threatens to increase, not decrease, the prospect of piecemeal litigation.

The particular sort of class certification proposed by Plaintiffs here also raises a concern of so-called "pendent plaintiff" jurisdiction, whereby "a plaintiff brings a federal claim against a defendant and a second plaintiff brings a factually related state law claim against the same defendant." *Zelaya,* 999 F.Supp. at 782. As noted in *Zelaya,* "[t]he Supreme Court has never considered the constitutionality of pend[e]nt-plaintiff jurisdiction," 999 F.Supp. at 782, and the case law as a whole is likewise inconclusive. Yet, as observed in a case cited by Plaintiffs, the plain terms of § 1367(a) make no distinction between "pendent-claim" and "pendent-party" jurisdiction, nor does the statute distinguish between the addition of defendants and the addition of plaintiffs under a court's supplemental jurisdiction. *See Ansoumana,* 201 F.R.D. at 92–94. Thus, the Court is inclined to agree with Plaintiffs that there is no out-

right statutory bar to the exercise of jurisdiction they now propose.

Nevertheless, the concerns inherent in pendent-plaintiff jurisdiction are not wholly irrelevant to the Court's discretionary decision whether to exercise supplemental jurisdiction over a state-law class action. Rather, the Court in *Zelaya* recognized, and this Court agrees, that a case involving "two different and distinct sets of plaintiffs," with the state-law plaintiff class being far more numerous, presents "exceptional circumstances" within the meaning of § 1367(c)(4). *Zelaya,* 999 F.Supp. at 783. Notably, the situation was different in *Ansoumana,* the lone case identified by Plaintiffs in which a court certified a state-law class action as supplemental to federal claims being pursued by a smaller number of plaintiffs. *Ansoumana* involved a federal collective action of over 300 individuals, and an overlapping state-law class of approximately 1,000 people. *See Ansoumana,* 201 F.R.D. at 85. In agreeing to exercise supplemental jurisdiction over the state-law class action, the Court found that "the state law claims are substantially similar to the federal law claims, and it is likely that they will either succeed or fail together." *Ansoumana,* 201 F.R.D. at 95.

The same cannot be said here, and Plaintiffs do not contend otherwise. Only a handful of individuals will be pursuing federal claims in this case, while Plaintiffs assert that their state-law class will number in the hundreds. This strikes the Court as a very large tail wagging a very small dog. In sharp contrast to the situation in *Ansoumana,* where the Court already had before it a large class of federal claimants, the proposed state-law class here will not merely incrementally but exponentially increase the scope of the proceedings and the number of affected individuals. Moreover, as explained above, the state and federal claims in this case will not invariably succeed or fail together, but instead will turn on distinct facts and different governing legal standards. All of this, in the Court's view, presents "exceptional circumstances" that provide "compelling reasons" for the Court to decline to exercise supplemental jurisdiction under § 1367(c)(4).

In any event, the Court is not persuaded that Plaintiffs' more limited class overcomes the various deficiencies noted in the Court's earlier Rule 23(a) analysis. The Court need not repeat that analysis here, but only observes, as one example, that Plaintiffs' fallback proposal does not promise to provide the typicality that was lacking with respect to Plaintiffs' initial attempt at class certification. Under Plaintiffs' latest state-law injunctive-only theory of recovery, the named Plaintiffs would have to establish that, notwithstanding any purported corporate policy against sexual harassment, Defendant has systematically failed to take prompt and adequate remedial action despite reasonable notice of sexual harassment at its plant. *See Chambers*, 614 N.W.2d at 916. Even as to this more limited question, and even as to the more limited universe of two individuals now proffered as named Plaintiffs,[31] the Court finds that the representative claims asserted by the named Plaintiffs feature idiosyncratic facts and allegations that threaten to undermine, rather than advance, the prospect for class-wide relief on behalf of Defendant's female employees.

First, regarding Plaintiff Marquis, the record indicates that she made only a single, somewhat vague complaint to her supervisor, Keith Keller, regarding co-worker Bob Soto's alleged misconduct toward her. This complaint that she was "sick and tired of [Soto's] mouth" did not explicitly raise the issue of sexual harassment. Soto's harassing behavior subsequently drew the attention of management when a private investigator, and not Marquis, mentioned it to Defendant's division director of human resources, Ike Growe. Even then, Marquis declined to pursue a formal complaint, and did not ask that Soto be discharged, but instead stated her preference to handle the matter herself. Despite Marquis's unwillingness to lodge a formal complaint, Defendant first suspended and then discharged Soto. On this record, a trier of fact's determination as to whether Defendant's management took prompt and appropriate action upon reasonable notice of Soto's harassing conduct—a question that turns upon myriad factual issues, including whether Marquis's complaint to Keller should have served as notice of harassment, and whether Defendant's discharge of Soto constituted prompt remedial action—would shed little light on the broader question whether Defendant has systematically failed to appropriately address complaints of sexual harassment.

Karin Conrad's principal complaints in this case, regarding alleged sexual harassment by Ike Growe, are even less likely to shed light on this broader question as to the existence and effectiveness of Defendant's anti-harassment policies. In particular, Conrad did not report Growe's alleged misconduct to management, nor did she pursue a grievance through the union. Yet, as Defendant points out, Conrad testified at her deposition that she knew that sexual harassment violated the work rules in the union contract, and that she was aware that the union contract included a grievance procedure. (Conrad Dep. at 155–57.) Conrad's arguable failure to pursue her known remedies against sexual harassment in the work place greatly diminishes her suitability as a class representative whose claims are typical of those of the class generally.[32] For these reasons, as well as those set forth earlier, the Court finds that Plaintiffs' proposed class, even in its more limited form, fails to satisfy the prerequisites of Rule 23(a).

## B. Defendant's Motions for Summary Judgment

### 1. The Standards Governing Defendant's Motions

Through six separate motions filed on November 30, 2000, Defendant seeks an award

---

**31.** Specifically, in their supplemental brief in support of their request for limited injunctive-only class certification under the Elliott–Larsen Act, Plaintiffs propose that Patricia Marquis and Karin Conrad serve as class representatives. This proposal apparently rests, at least in part, on the fact that these two individuals remain employed by Defendant, while most or all of the other named Plaintiffs are not, so that these latter individuals lack a stake in any injunctive relief that might be awarded.

**32.** In addition, as discussed below, Plaintiff Conrad's complaints of sexual harassment fail to survive summary judgment, rendering her ineligible to represent the proposed class.

of summary judgment in its favor on each individual Plaintiff's state and federal claims of sex discrimination and retaliation, as well as Plaintiffs' state-law claims of intentional infliction of emotional distress. Under the relevant Federal Rule, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

Three 1986 Supreme Court cases—*Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the federal courts' review of motions for summary judgment. These cases, in the aggregate, lowered the movant's burden in seeking summary judgment.[33] According to the *Celotex* Court:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

After reviewing the above trilogy, the Sixth Circuit adopted a series of principles governing motions for summary judgment. These principles include:

* Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

* The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient

opportunity for discovery, has no evidence to support an essential element of his or her case.

* The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

* The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

* The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir.1989). *See also Nernberg v. Pearce*, 35 F.3d 247, 249 (6th Cir.1994). The Court will apply these standards in considering Defendant's motions.

### 2. Plaintiffs' Claims of Sexual Harassment

Each of the six named Plaintiffs in this case has asserted claims of hostile work environment sexual harassment under both federal and state law. Through its present motions, Defendant seeks summary judgment in its favor on all of these claims, state and federal alike. In support of its motions, Defendant argues (i) that certain of Plaintiffs' claims are barred by the relevant federal or state statute of limitations; (ii) that some of the Title VII claims lie outside the scope of the EEOC charges filed by Plaintiffs, and therefore cannot be addressed in this action; (iii) that some of the conduct complained of by Plaintiffs is not sufficiently severe and pervasive to sustain a hostile work environment claim; (iv) that some claims are defeat-

---

**33.** "Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials."

10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure*, § 2727, at 33 (1993 Supp.).

ed by Plaintiffs' failure to report the alleged misconduct to management; (v) that, in some instances, Defendant's prompt remedial action defeats any claim arising from the alleged misconduct; and (vi) that, as to one set of claims asserted by Plaintiff Rhonda Mac-Donald, the behavior in question does not constitute discrimination because of her sex, as required to sustain a claim of sexual harassment.

### (a) The Substantive Law Governing Sexual Harassment Claims

Before addressing these arguments, the Court first sets forth the general standards governing hostile work environment sexual harassment claims under federal and state law. The federal Title VII standards were refined in a pair of recent Supreme Court decisions, *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). The Sixth Circuit, in turn, recently construed these Supreme Court precedents in *Williams v. General Motors Corp.*, 187 F.3d 553, 560–61 (6th Cir. 1999).

As explained in *Williams*, hostile work environment claims under Title VII must now be analyzed under two different standards, depending on whether a claim stems from the actions of a supervisor or a co-worker.[34] The first four elements of a claim are the same under either standard, with the plaintiff having the burden to show: (1) that she was a member of a protected class; (2) that she was subject to unwelcome sexual harassment; (3) that this harassment was based on her sex; and (4) that this harassment created a hostile work environment. *See Williams*, 187 F.3d at 560. Where the plaintiff has satisfied these elements and the perpetrator is a supervisor, the question becomes whether the harassment resulted in a "tangible employment action," such as discharge or demotion. 187 F.3d at 561 & n. 2. If so, the employer's

"liability is automatic." 187 F.3d at 561 n. 2. If not, the employer may avoid liability, by establishing as an affirmative defense that it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and that "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher*, 524 U.S. at 807, 118 S.Ct. at 2293.

Where, on the other hand, the hostile work environment arises from a co-worker's actions, the plaintiff must establish an additional element, beyond the four set forth above. Specifically, the plaintiff must show that her employer "knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action." *Williams*, 187 F.3d at 561 (internal quotations and citation omitted).

Under Michigan's Elliott–Larsen Act, the applicable standards are different. In particular, in *Chambers, supra*, 614 N.W.2d at 917–18, the Michigan Supreme Court expressly declined to adopt the decisions in *Ellerth* and *Faragher* as correct statements of Michigan law, and instead adhered to prior Michigan precedents distinguishing between the "quid pro quo" and "hostile work environment" forms of sexual harassment. In the former, quid pro quo situation, the employer is strictly liable if its agent "used submission [to] or rejection of unwelcome sexual conduct or communication as a factor in decisions affecting [the plaintiff's] employment." *Chambers*, 614 N.W.2d at 916 (internal quotations and citation omitted). On the other hand, where a hostile work environment has been created through "unwelcome sexual communication or conduct [which] substantially interferes with an individual's employment," an employer is liable for this violation only if it "failed to take prompt and adequate remedial action after

---

34. In addition, *Williams* observes that the Supreme Court has "signaled a shift from the use of the terms 'hostile work environment' and 'quid pro quo' in the employment liability context," stating that these terms "are not controlling for

purposes of establishing employer liability," but are relevant only to the "threshold question whether a plaintiff can prove discrimination in violation of Title VII." *Williams*, 187 F.3d at 561 n. 2 (internal quotations and citations omitted).

having been reasonably put on notice of the harassment." 614 N.W.2d at 916.

### (b) Defendant's Statute of Limitations Defenses

As the first basis for its several motions, Defendant appeals to the relevant 300–day and 3–year periods of limitation under Title VII and Michigan's Elliott–Larsen Act, respectively. To be deemed timely under Title VII, an EEOC charge must be filed "within three hundred days after the alleged unlawful employment practice occurred," 42 U.S.C. § 2000e–5(e)(1), and, as noted earlier, the courts have recognized that the filing of a timely charge with the EEOC is a prerequisite to a Title VII action, *see, e.g., Sherman v. Optical Imaging Systems, Inc.,* 843 F.Supp. 1168, 1179–80 (E.D.Mich.1994). Next, claims brought under Michigan's Elliott–Larsen Act are governed by a three-year statute of limitations. *See* Mich. Comp. Laws § 600.5805(8); *Jackson v. Quanex Corp.,* 191 F.3d 647, 667 & n. 7 (6th Cir.1999). There is no question that some of the allegations made by Plaintiffs here concern events occurring outside of these periods of limitation. Defendant argues, therefore, that the claims arising from such allegations must be dismissed as time-barred.

In seeking to avoid such dismissals, Plaintiffs appeal to the "continuing violation" theory. This theory is available under both Michigan and federal law, *see Jackson,* 191 F.3d at 667; *Gallagher v. Croghan Colonial Bank,* 89 F.3d 275, 278 (6th Cir.1996), and stands as a "narrowly limited exception[ ] to the usual rule that statutes of limitations ... are triggered at the time the alleged discriminatory act occurred," *Dixon v. Anderson,* 928 F.2d 212, 216 (6th Cir.1991) (internal quotations and citation omitted). The principal rationale behind this theory "is that many discriminatory acts occur in such a manner that it is difficult to define precisely when they took place," so that "[o]ne might say they unfold rather than occur." *Bell v. Chesapeake & Ohio Railway Co.,* 929 F.2d 220, 223 (6th Cir.1991).

The continuing violation theory is unavailable unless, as a threshold matter, there is evidence of a "present violation, *i.e.,*

a discriminatory act within the limitation period." *Bell,* 929 F.2d at 223; *see also Haithcock v. Frank,* 958 F.2d 671, 677 (6th Cir. 1992). Having satisfied this prerequisite, the plaintiff then may appeal to one of two subspecies of the doctrine. First, the plaintiff may identify a "continually recurring violation," such that "the employer commits an illegal act, such as giving unequal pay for equal work, *each time* the employer dispenses the unequal pay." *Dixon,* 928 F.2d at 216. This category of "continuing violation" must necessarily rest upon the identification of a "specific discriminatory polic[y] or mechanism[ ]," or a "discriminatory employment test[ ]," and "multiple incidents of discrimination, even similar ones, that are not the result of a discriminatory policy or mechanism do not amount to a continuing violation" under this variation of the theory. *Lambert v. Genesee Hosp.,* 10 F.3d 46, 51 (2d Cir. 1993). Although Plaintiffs here seek to elevate Defendant's purportedly inadequate and ineffective practices and procedures for addressing sexual harassment to the level of a "policy," the Court declines to view this as an express policy of discrimination of the sort necessary to apply the first subcategory of the continuing violation theory. Rather, this "policy"—while perhaps fostering an environment in which harassment is tolerated, and thereby providing a basis for charging Defendant with liability—is not itself the "cause" of the instances of harassment alleged by Plaintiffs.

Thus, Plaintiffs must succeed, if at all, under the second subcategory of this theory. This requires a showing that "the current violation, falling within the limitations period, is indicative of a pattern of similar discriminatory acts continuing from the period prior to the limitations period." *Gallagher,* 89 F.3d at 278. This variant of the continuing violation doctrine is intended to reach the situation where, by virtue of the nature of the alleged discrimination, "the worker did not—and could not—become aware of the need to take legal action to vindicate her rights until a period of time had elapsed." *Bell,* 929 F.2d at 224; *see also Hardin v. S.C. Johnson & Son, Inc.,* 167 F.3d 340, 344 (7th Cir.1999) (explaining that

the doctrine applies "[w]hen it would be unreasonable to expect the plaintiff to perceive offensive conduct as Title VII harassment before the limitations period runs, or the earlier discrimination may only be recognized as actionable in light of events that occurred later, within the period of the statute of limitations" (internal quotations and citation omitted)).

As Plaintiffs correctly point out, the application of this theory is particularly appropriate in cases alleging a hostile work environment, where a series of incidents must be considered under "the totality of circumstances," *Williams*, 187 F.3d at 562, and a single episode of misconduct would not necessarily provide notice of a claim. Some relevant factors considered by the courts in determining whether to apply this variant of the continuing violation doctrine include subject matter—*i.e.*, whether the alleged acts involve the same type of discrimination—frequency, and permanence—*i.e.*, whether an act should independently trigger an employee's awareness of the need to assert her rights, or should suggest to the employee that adverse consequences will follow regardless of a continuing intent to discriminate. *See Berry v. Board of Supervisors of L.S.U.*, 715 F.2d 971, 981 (5th Cir.1983); *see also Jackson*, 191 F.3d at 668 (finding that the doctrine applied where the incidents of harassment "were similar in type and recurred frequently," and where "Jackson reasonably did not become aware of the need to vindicate her rights until after some time elapsed and she discovered she was the victim of a continuing policy or pattern of discrimination"); *Haithcock*, 958 F.2d at 678 (applying the doctrine where, prior to the employer's most recent action, "it appears that [the plaintiff] had no reason to complain"); *Bell*, 929 F.2d at 223–24 (discussing *Berry*).

With these principles in mind, the Court turns to the facts and allegations of this case. First, regarding Plaintiff Patricia Marquis, she filed her EEOC charge in May of 1999, and her Title VII claims arising prior to July of 1998 would generally be time-barred, absent appeal to the continuing violation theory. Her first complaint, concerning offensive photographs and notes on her cleaning cart in the summer of 1996, cannot be viewed as part of a "pattern" of discriminatory acts or linked to subsequent harassment, where the next incidents she cites, involving Bob Soto, occurred after she was reassigned to a different job in a different area, and were, apart from also involving sexual harassment, of a somewhat different character. Moreover, Marquis evidently suspected at the time that this incident constituted harassment, as she and co-Plaintiff Lisa Davis reported the matter to the union and to Human Resources. *See Hardin*, 167 F.3d at 344–45 (citing complaints to management as a basis for denying application of the continuing violation theory). Further, this claim falls outside the 3–year statute of limitations for bringing claims under Michigan's Elliott–Larsen Act, since the present suit was filed in December of 1999.

Next, while Marquis testified to three sporadic incidents of harassment by co-worker Bob Soto dating as far back as 1995, she stated that this harassment became more severe in the 1997–98 time frame, and that incidents of this misconduct continued into the fall of 1998. Moreover, Soto's alleged harassment of Marquis plainly fits into a "pattern of similar discriminatory acts," as needed to trigger the continuing violation doctrine, and Marquis would not necessarily have been aware that Soto's conduct was creating an allegedly hostile work environment until it continued, and indeed escalated, over a period of time. The Court finds, therefore, that Marquis has raised sufficient issues of fact as to the application of the continuing violation theory to her claims arising from Soto's alleged harassment.

Turning to Plaintiff Annette Richmond, the Court finds that several of her claims are time-barred. She filed her EEOC charge in December of 1999, so that any Title VII claims predating February of 1999 are presumptively barred. This encompasses: (i) her allegations of harassment by supervisor Larry Carson between 1993 and 1997; (ii) her allegations of co-worker harassment in 1996 and 1997; and (iii) her complaint that Bob Soto sexually harassed her in 1997. Richmond has not offered sufficient evidence

to establish these episodes as part of an ongoing pattern of related discriminatory acts. However, the Court finds that issues of fact preclude a determination as a matter of law as to the timeliness of Richmond's claims regarding: (i) ongoing sexual harassment by supervisor Dave Soto between 1993 and 1999, particularly where this alleged harassment reportedly intensified in the last two years before her resignation in September of 1999; (ii) the posting by co-worker Larry Spiegel of offensive pictures from 1997 to 1999; and (iii) ongoing sexual harassment by co-worker and supervisor Sam Faz in 1998 and 1999.

Next, regarding Plaintiff Erika Swain, she filed her EEOC charge in October of 1999, so that her Title VII claims arising before the end of 1998 are presumptively time-barred. She has not provided a sufficient basis for the application of the continuing violation theory with respect to: (i) her allegations of supervisor and co-worker harassment during the 1994–96 time frame that she reported to supervisor Larry Carson;[35] (ii) the alleged crude remarks and offensive conduct of superintendent Jesse Higgins in 1995 and 1997; (iii) her allegations of sexual harassment by Bob Soto when she worked at the switchboard in 1997–98; (iv) her complaints of offensive remarks by Sam Faz in 1994–95 and 1996–97; and (v) her complaints of mistreatment by co-worker Danny Alcorta and offensive statements by other co-workers when she worked on the high-side line in 1998.

Next, Plaintiff Lisa Davis filed her EEOC charge in December of 1999, meaning that her Title VII claims arising prior to February of 1999 are presumptively time-barred. This includes the claims arising from her allegations: (i) that co-worker Terry Blevins attempted to rape her in 1995 or 1996, particularly where she testified that she reported this incident to Human Resources; (ii) that Bob Soto made inappropriate comments to her in this same time frame; (iii) that, over a period of a couple of days in the spring of 1996, offensive photos and notes were left on a cleaning cart used by her and co-Plaintiff Patricia Marquis;[36] and (iv) that she was attacked by co-worker Jerry Burke in late 1998. Depending on the precise timing of the relevant incidents, Davis's Title VII claims also might be barred with respect to: (i) a sexually suggestive note left on her hi-lo at some point in 1998 or 1999; and (ii) the offensive cartoon involving the Taco Bell dog, which allegedly was passed around the white room in 1997, 1998, or 1999. Davis has not provided any basis to apply the continuing violation theory with respect to these claims, which seemingly involve discrete incidents that do not fit into any sort of overall pattern of harassment.

Turning next to Plaintiff Rhonda MacDonald, she filed her EEOC charge in December of 1999, so that her Title VII claims arising prior to February of 1999 are presumptively time-barred. This encompasses her allegations: (i) that supervisor Jesse Higgins yelled and cursed at her in 1994, particularly where she complained about this conduct to Human Resources; (ii) her complaints of sexual harassment by supervisor Larry Carson and co-workers Sam Faz and Dave Keith when she worked in the welding department in 1994 and 1995;[37] and (iii) her allegations of co-worker sexual harassment in the white room in the spring of 1997. Again, MacDonald has not identified any basis for the application of the continuing violation theory to bring these claims within the statute of limitations, where they are not in any way linked to her subsequent claims involving her estranged husband, and where she had moved to a different department before these latter claims arose.

Finally, Plaintiff Karin Conrad filed her EEOC charge in December of 1999, so that any Title VII claims arising before February of 1999 are presumptively time-barred.

---

**35.** Depending on the specific dates of this alleged misconduct, Swain's Elliott–Larsen claims arising from these incidents might also be time-barred. The record does not permit this determination as a matter of law, however.

**36.** These three claims also are barred under the Elliott–Larsen Act's 3–year statute of limitations, absent evidence that the 1996 incidents occurred after December 13 of that year.

**37.** These first two sets of claims also are barred under Elliott–Larsen's 3–year statute of limitations.

Thus, absent a showing of a continuing violation, she cannot pursue her claims of co-worker harassment in 1997. Again, the Court finds no basis for viewing these as continuing violations, where none of the co-workers in question was involved in any later alleged incidents, and where Conrad had moved to a different job before experiencing any further episodes of alleged harassment in 1999.

### (c) Claims Allegedly Beyond the Scope of Plaintiffs' EEOC Charges

 As its next ground for seeking an award of summary judgment in its favor, Defendant asserts that certain of Plaintiffs' Title VII claims are outside the scope of the allegations made in their EEOC charges, and thus may not be raised in this action. "Federal courts do not have subject matter jurisdiction to hear Title VII claims unless the claimant explicitly files the claim in an EEOC charge or the claim can reasonably be expected to grow out of the EEOC charge." *Abeita v. TransAmerica Mailings, Inc.*, 159 F.3d 246, 254 (6th Cir.1998). But, "where facts related with respect to the charged claim would prompt the EEOC to investigate a different, uncharged claim, the plaintiff is not precluded from bringing suit on that claim." *Davis v. Sodexho, Cumberland College Cafeteria*, 157 F.3d 460, 463 (6th Cir. 1998). "This expanded rule does not mean, however, that plaintiffs are excused from filing charges on a particular discrimination claim before suing in federal court." 157 F.3d at 463.

This argument adds little to what Defendant already has achieved through its statute of limitations defense. Nearly all of the allegations of sexual harassment which Defendant cites as beyond the scope of Plaintiffs' EEOC charges involve past incidents that also lie outside the 300–day Title VII period of limitation. Upon reviewing the record, the Court finds that the only claim within the period of limitation that might be reached by this "beyond the scope" defense is Plaintiff Swain's complaints that human resources director Ike Growe acted inappropriately toward her on several occasions over the first few months of 1999. Swain's EEOC charge

does not appear to mention these complaints, but instead cites only misconduct by fellow employees and supervisors in January of 1999. Nevertheless, the Court declines to dismiss these complaints as outside the scope of Swain's EEOC charge, where Growe was centrally involved in investigating and responding to the complaints that *were* raised in this EEOC charge. It seems likely, then, that any EEOC investigation of the charged allegations would have led the agency to also investigate Growe's interactions with Swain as he addressed these allegations.

### (d) The "Severe and Pervasive" Nature of the Alleged Conduct

 Defendant next challenges certain of Plaintiffs' claims as not resting upon allegations of sufficiently "severe and pervasive" harassment to create a hostile work environment. As stated by the Supreme Court, an actionable hostile work environment exists under Title VII "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993) (internal quotations and citations omitted). Similarly, under Michigan's Elliott–Larsen Act, a hostile work environment arises where "one or more supervisors or co-workers create an atmosphere so infused with hostility toward members of one sex that they alter the conditions of employment for them." *Radtke v. Everett*, 442 Mich. 368, 501 N.W.2d 155, 163 (1993) (internal quotations and citation omitted).

 It bears emphasis that Title VII is not "a general civility code," but instead calls upon the courts to consider the relevant conditions and circumstances of the workplace:

> The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. Common sense, and an appropriate sensi-

tivity to social context, will enable courts and juries to distinguish between simple teasing or roughhousing ... and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive. *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81–82, 118 S.Ct. 998, 1002–03, 140 L.Ed.2d 201 (1998). Thus, "courts must be mindful of the need to review the work environment as a whole, rather than focusing single-mindedly on individual acts of alleged hostility." *Williams*, 187 F.3d at 563. Yet, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to" a hostile work environment under Title VII. *Faragher*, 524 U.S. at 788, 118 S.Ct. at 2283 (internal quotations and citation omitted). Similar standards have been applied by the Michigan courts, which have looked to federal Title VII precedents for guidance. *See, e.g., Radtke*, 501 N.W.2d at 164–68; *Grow v. W.A. Thomas Co.*, 236 Mich.App. 696, 601 N.W.2d 426, 433 (1999).

Regarding the principal complaints of four of the six Plaintiffs—Richmond, Swain, Davis, and MacDonald—Defendant does not contend that these allegations, if proven, would fail to sustain a finding of severe and pervasive harassment. Defendant does make such an argument, however, with respect to Plaintiffs Marquis and Conrad. The Court cannot agree as to Plaintiff Marquis, but finds that Plaintiff Conrad's allegations of misconduct by Ike Growe are insufficient as a matter of law to create a hostile work environment under Title VII or the Elliott–Larsen Act.

■ Turning first to Plaintiff Marquis, Defendant argues that her complaints of misconduct by co-worker Bob Soto amount to mere annoyances, and do not, as a matter of law, rise to the level of severe and pervasive harassment. The Court views the record differently. Soto allegedly engaged in this conduct over a period of years, repeatedly making sexually inappropriate remarks and occasionally making physical contact with Marquis. The private investigator hired by Defendant confirmed the severity of Soto's inappropriate behavior, reporting that Soto made overt sexual remarks, rubbed his groin against Marquis's leg, and stroked her breast. Marquis further testified that Soto bit her neck on one occasion. The situation was aggravated, according to Marquis, by her supervisor's failure to take action; to the contrary, Marquis testified that this supervisor himself made a crude sexual remark to her on one occasion. Under the totality of these circumstances, the Court cannot say as a matter of law that the conduct identified by Plaintiff Marquis does not amount to severe and pervasive harassment that created a hostile work environment.

■ The situation is different as to Plaintiff Conrad, however. Her principal complaints are directed at human resources director Ike Growe, who, she testified (i) would look at her inappropriately as she walked by, (ii) made several comments about her hair, (iii) touched or squeezed her shoulder on a few occasions in the summer of 1999, sometimes leaving his hand on her shoulder as he made small talk on various subjects, and (iv) on one occasion in October of 1999, put his hands on Conrad's shoulders and pretended to throw her into a box that she was bent over at the time. Admittedly, it is particularly unfortunate that someone in Growe's position, with his responsibility for identifying and remediating all forms of workplace discrimination, would engage in any workplace behavior whatsoever that could be considered inappropriate or harassing in nature. Yet, the complaints raised by Conrad against Growe all involve offhand remarks and isolated incidents, none of which was severe standing alone. Even when viewed in the aggregate, as dictated by the governing law, the Court still concludes that Growe's behavior, while plainly irritating and demeaning, was not sufficiently severe and pervasive to alter the conditions of Conrad's employment. *See Burnett v. Tyco Corp.*, 203 F.3d 980, 984–85 (6th Cir.2000) (holding that three allegations spanning a six-month period, one of which involved physical contact where a personnel manager placed a pack of cigarettes under the plaintiff's shirt and brassiere strap, did not suffice to establish a hostile work environment).

Defendant also argues that a number of Plaintiffs' subsidiary complaints of harass-

ment are subject to dismissal as not involving severe or pervasive misconduct. Many of these complaints, again, have already been determined to be foreclosed under the governing statutes of limitations. The Court agrees, however, that a few additional complaints are reached and precluded by this argument: (i) Plaintiff Swain's allegations that co-worker Bob Soto made two inappropriate comments to her in 1997–98, and that Ike Growe hugged her and made inappropriate personal remarks on a few occasions in early 1999; (ii) Plaintiff Davis's claims that an unidentified co-worker placed a sexually suggestive note on her hi-lo in 1998 or 1999, that a co-worker named Indio made inappropriate comments to her in the same time frame and then again after this suit was filed, and that an offensive cartoon was passed around her department at some point between 1997 and 1999; and (iii) Plaintiff Conrad's allegations that, in early 2000, a co-worker inappropriately approached her from behind as she was bent over, and that another co-worker yelled and swore on a number of occasions.[38] These complaints all involve isolated incidents that are not linked to these Plaintiffs' principal claims of harassment, either temporally or in their alleged perpetrators. Indeed, many of these incidents occurred in different departments to or from which Plaintiffs had transferred before or after the time of their principal complaints. Hence, there is no basis for treating these allegations as part of an overall atmosphere of harassment, and the incidents themselves are not so severe, standing alone, as to permit the conclusion that they fostered a hostile work environment.

▆▆▆ The Court cannot agree with Defendant, however, as to the purported lack of severity and pervasiveness of Plaintiff MacDonald's allegations of co-worker harassment in early 1997, as these complaints encompass a whole series of sexual jokes, crude remarks, and teasing by several co-workers, as well as the placing of notes on her back with sexual comments. These sorts of repeated, ongoing, and seemingly commonplace inci-

dents and remarks involving a number of individuals preclude a determination as a matter of law as to the existence of a hostile work environment. Likewise, Plaintiff Swain's allegations of inappropriate comments made to her by Larry Carson in 1998 and early 1999, while perhaps insufficient on their own to be deemed severe and pervasive, must be viewed alongside Swain's principal complaint that Carson was one of two supervisors who viewed the videotape of Swain and co-worker Chris Stoddard having sex. Under the totality of circumstances, the Court cannot say as a matter of law that Carson's remarks did not contribute to the hostile work environment allegedly experienced by Plaintiff Swain.

### (e) Plaintiffs' Alleged Failure to Report Certain Misconduct

As its next basis for challenging certain of Plaintiffs' claims, Defendant points to Plaintiffs' apparent failure to report some of their allegations of sexual harassment to management. As observed earlier, notice to the employer remains an element of a plaintiff's hostile work environment claim under Michigan's Elliott–Larsen Act, regardless of whether the harassing conduct at issue originates with a supervisor or a co-worker. *See Chambers, supra,* 614 N.W.2d at 916–18. In contrast, under Title VII, only co-worker harassment triggers a plaintiff's burden to show that her employer "knew or should have known of the charged sexual harassment." *Williams,* 187 F.3d at 561 (internal quotations and citation omitted). Defendant argues that this element of notice is absent with respect to some of the claims asserted by Plaintiffs Marquis, Richmond, Swain, Davis and Conrad.

Turning first to Plaintiff Marquis, the Court finds that issues of fact preclude a determination as a matter of law regarding Defendant's knowledge or notice of the alleged harassment of Marquis by co-worker Bob Soto. As evidence of the requisite notice, Plaintiff points to her deposition testimony (i) that she complained to her supervisor, Keith

---

**38.** In light of these conclusions, the Court notes that none of Plaintiff Conrad's allegations of sex-

ual harassment survive summary judgment.

Keller, that she was "sick and tired of [Soto's] mouth," (Marquis Dep. at 67), (ii) that she demanded that Keller do something about the situation, and (iii) that Keller was actually present on a few occasions when Soto engaged in inappropriate behavior. Although Defendant asserts that this evidence is too vague and ambiguous to establish notice, the Court finds that it would permit a reasonable inference that Defendant knew or should have known about Soto's alleged misconduct.

Regarding Plaintiff Richmond, Defendant argues that it lacked sufficient notice of her complaints of misconduct by Sam Faz, Ray Martinez, and Dave Soto. At least two of these individuals, Martinez and Soto, were Richmond's supervisors during at least part of the period of their alleged misconduct, thus triggering the different liability standards under Title VII and the Elliott–Larsen Act.[39] To the extent that Defendant seeks to establish, as a matter of law, its Title VII affirmative defense to vicarious liability for a supervisor's actions, the Court finds that issues of fact preclude any conclusive determination as to whether Defendant "exercised reasonable care to prevent and correct promptly" the harassing conduct of its supervisory personnel, *Faragher*, 524 U.S. at 807, 118 S.Ct. at 2293, particularly in light of Plaintiffs' evidence that Defendant's anti-harassment policies and procedures were either non-existent, unpublicized, or largely ineffective. As observed in *Faragher*, the absence of such policies and procedures does not necessarily foreclose an employer's appeal to the Title VII affirmative defense, but this surely is an important consideration. *See Faragher*, 524 U.S. at 807, 118 S.Ct. at 2293.

 Under the different standards of Michigan law, however, the Court finds as a matter of law that Defendant lacked notice of Plaintiff Richmond's complaints regarding the conduct of Sam Faz and Ray Martinez.[40] Richmond concedes that she did not complain to management about these incidents; she testified that she did not challenge Faz's conduct because he "was [a] supervisor," (Richmond Dep. at 114), and that she told Martinez himself to cease his conduct, without taking her complaints up the chain of command. Plainly, the requirement of notice cannot be excused or somehow "inferred" whenever the alleged perpetrator is a supervisor, as this would altogether vitiate the Michigan Supreme Court's ruling in *Chambers* that notice is an element of a hostile work environment claim, regardless of whether the allegations involve a co-worker or a supervisor. The result is different, though, as to the allegations concerning Dave Soto, where Richmond testified that she did bring at least some of these charges to the attention of other supervisors, including Dave Johnson and Trina Higgins, and she further stated that Higgins actually witnessed some of Soto's conduct. These latter claims, then, do not fail for lack of evidence of notice to Defendant.

Regarding Plaintiff Swain, the Court first observes that, apart from her principal complaint arising from the 1997 videotape, virtually all of her other Title VII claims have already been disposed of, under either statute of limitations or other grounds. While the situation is somewhat different with regard to Swain's Elliott–Larsen claims, in light of the Michigan statute's longer three-year period of limitation, these remaining state-law claims run afoul of Swain's utter lack of complaint to or discussion with management regarding any of her allegations of harassment—with the exception, again, of

---

**39.** Faz apparently was a co-worker at the time of some of the conduct attributed to him by Richmond, and then was promoted to supervisor at the time of other alleged incidents. Unfortunately, the record does not reveal whether Faz, following his promotion, was "a supervisor with immediate (or successively higher) authority over" Richmond, as required to invoke the broader rule of vicarious employer liability under Title VII. *See Faragher*, 524 U.S. at 807, 118 S.Ct. at 2293. The Court necessarily must assume, for present purposes, that Faz possessed such authority.

**40.** Given that the federal and Michigan standards are similar as to co-worker harassment, it follows that Plaintiff Richmond's Title VII claims arising from Faz's alleged misconduct as a co-worker also fail for lack of evidence of Defendant's notice of this conduct.

the incidents relating to the videotape.[41] The only other evidence of notice to Defendant concerns Swain's complaints of mistreatment by co-worker Danny Alcorta and offensive statements by other co-workers when she worked on the high-side line in 1998. Although Swain also failed to complain to management regarding these incidents, she has testified that her supervisor, Dave Soto, witnessed them as they occurred. With the exception of these claims and those involving the videotape, the Court finds that Plaintiff Swain's remaining Elliott–Larsen claims of sexual harassment fail for lack of evidence that Defendant was put on notice of her complaints.

■ Turning to Plaintiff Davis, many of the complaints of which Defendant claims it lacked notice already have been rejected by the Court on other grounds. In fact, it appears to the Court that only one of Davis's complaints of sexual harassment still remains, and then only under the Elliott–Larsen Act—specifically, her allegations of a physical attack and harassment by co-worker Jerry Burke in 1998: Davis testified that she was urged by others to "take [Burke] to the office," to "go up front and complain," and to "go to personnel" regarding this incident, but that she did not do so because, in her view, Defendant has failed to take action in response to her complaints of harassment back in 1995 and 1996. (Davis Dep. at 178–79.) Instead, she approached co-worker Bob Soto, who she regarded as Burke's friend, and told him to "tell your friend Jerry Burke to leave me alone; if he was going to bother me one more time, I was going to take him to the office for sexual harassment." (*Id.* at 167.) Davis testified that this ended the

matter, and that Burke "never bothered me after that." (*Id.*)

At oral argument, Plaintiffs' counsel suggested that Davis's comments to Bob Soto served to put Defendant on notice of Burke's misconduct, because Soto was a "group leader." (7/26/01 Hearing Tr. at 91.) Initially, the Court notes that there is no evidence in the record to confirm Soto's status as a group leader. In any event, the Michigan Court of Appeals recently held that, in order to put an employer on actual notice of sexual harassment, an employee must lodge a complaint with "higher management," meaning "someone in the employe[e]'s chain of command who possesses the ability to exercise significant influence in the decision-making process of hiring, firing, and disciplining the offensive employee." *Sheridan v. Forest Hills Public Schools*, 247 Mich.App. 611, 637 N.W.2d 536, 542–43 (2001).[42] Applying this standard to the case before it, the Court found that the plaintiff custodian's report of sexual harassment to a "head custodian" did not afford actual notice to the employer that would trigger *respondeat superior* liability. 637 N.W.2d at 543–44. In so ruling, the Court noted the plaintiff's testimony acknowledging that she did not report her complaints of sexual harassment to any of her "'recognized' supervisors." 637 N.W.2d at 544.

Similarly, in this case, there is no evidence that Bob Soto possessed any authority or influence in Defendant's decision-making process of disciplining the allegedly harassing employee, Jerry Burke. Indeed, Davis herself, like the plaintiff in *Sheridan*, has acknowledged that she did not approach Soto out of any perception that he could act in any

---

**41.** Regarding the inappropriate remarks allegedly made by Larry Carson to Swain during the time that he was her supervisor, Swain testified that she initially did not report these comments because she was afraid to, and that she, like Richmond, ultimately confronted her supervisor and asked him to cease his conduct. As noted previously, the Court finds that this direct confrontation did not serve to put Defendant on notice of Carson's alleged harassment. Michigan law requires that something more be done to alert the employer to alleged harassment, whether by a supervisor or a co-worker.

**42.** *Sheridan* further explains that, as an alternative to actual notice, an employer may be deemed to have "constructive knowledge" of sexual harassment, in cases where the harassment is so pervasive that the employer's knowledge can be inferred. 637 N.W.2d at 545. Davis seemingly does not raise a claim of constructive notice here, but instead has stated that her failure to report the matter to management was based on her belief that it would have been futile to do so. At any rate, Burke's alleged misconduct was so different in nature from any of Davis's (or any Plaintiff's) other allegations of harassment as to preclude a finding of pervasiveness that would support an inference of notice.

sort of management or formal disciplinary capacity. Rather, she specifically elected not to take her complaint to management, but instead to seek the informal assistance of Soto as a friend of Burke. Under this record, the Court cannot conclude that Defendant was placed on notice of Burke's alleged misconduct as required to charge the company with liability under Michigan's Elliott–Larsen Act.

Finally, regarding Plaintiff Conrad, the Court notes that all of her claims of harassment already have been found subject to summary judgment on other grounds. Nevertheless, as to Conrad's complaints of misconduct in 1999 by supervisor Dave Soto and human resources director Ike Growe, and her allegations of co-worker harassment at the Orbitec facility in 2000, the Court agrees with Defendant that there is no evidence that Conrad reported these complaints to management or the union. However, Growe's alleged misconduct apparently was reported to management in September of 1999 through an anonymous letter, thereby raising an issue of fact as to Defendant's knowledge of these allegations. In addition, given Soto's and Growe's management positions, Conrad's lack of complaint would not necessarily preclude her from pursuing Title VII claims arising from her 1999 allegations of sexual harassment. Consequently, this argument at most provides only an alternative basis for awarding summary judgment to Defendant as to (i) Conrad's Elliott–Larsen claim arising from Soto's alleged harassment in 1999, and (ii) her state and federal claims arising from co-worker harassment at the Orbitec facility in 2000.

### (f) Defendant's Claims of Prompt Remedial Action

 Next, Defendant argues that various of Plaintiffs' sexual harassment claims are defeated by virtue of the prompt remedial action it took when it learned of the underlying incidents of alleged harassment. Such prompt and adequate remedial action, if shown, defeats a hostile work environment claim under Michigan's Elliott–Larsen Act, regardless of whether the perpetrator is a supervisor or a co-worker. *Chambers,* 614

N.W.2d at 916–18. However, under Title VII, this "prompt remedial action" standard applies only where a co-worker's actions give rise to a hostile work environment. *See Williams,* 187 F.3d at 561. In contrast, and as noted earlier, an employer is presumed liable under Title VII for a supervisor's harassing conduct, subject to an affirmative defense that the employer "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and that the plaintiff employee "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher,* 524 U.S. at 807, 118 S.Ct. at 2293.

In the present case, Defendant contends that it took prompt remedial action as to certain of the complaints raised by Plaintiffs Marquis, Richmond, and Swain. Regarding Plaintiff Marquis's complaints of harassment by co-worker Bob Soto, Defendant asserts that it first learned of this behavior when an undercover investigator reported it to human resources director Ike Growe in the fall of 1998. Defendant argues that it took prompt action in response to this information, first suspending and then terminating Soto, all within a few days. The Court cannot accept this view of the record as a matter of law, however, in light of its earlier conclusion that issues of fact remain as to whether Defendant knew or should have known of Soto's misconduct far earlier, either through Marquis's complaints to her supervisor, Keith Keller, or through Keller's own purported observation of, or at least opportunity to observe, Soto's harassment of co-worker Marquis.

 Turning next to Plaintiff Richmond, Defendant asserts that it took prompt remedial action upon learning of her allegations of harassment by three co-workers in June of 1999. Specifically, Defendant states that its human resources department investigated these complaints and concluded, upon interviewing all four employees, that it was Richmond's word against that of her three co-workers, each of whom contended that Richmond had instigated the disputes by making derogatory remarks about them and their families. Based on this investigation, all four

employees were warned to cease their inappropriate conduct or face further disciplinary action. Although Richmond might not have been satisfied by this disposition, Defendant argues that such disagreement does not call into question the overall adequacy of its response under the governing law.

Whatever the legal merit of Defendant's argument, however, it fails to account for the full evidentiary record. In particular, Richmond has testified that, immediately upon returning to her workstation in August of 1999 after she and her co-workers were warned to cease their inappropriate conduct, her co-workers began "running their mouths" and calling her a "crybaby." (Richmond Dep. at 156.) In addition, one of her co-workers allegedly threw a bolt at her, hitting her in the face and bruising her. Richmond testified that she reported this to her supervisor, Ray Martinez, who "just kind of sh[ook] his head a little bit, like no big deal." (*Id.* at 157.) Indeed, even during the investigation itself, Richmond claims that Ike Growe made inappropriate comments, inquiring about a co-worker who Richmond was dating and asking, "[D]oes he give you money, is that why you go out with him?" (*Id.* at 139.) All of this surely raises issues of fact as to whether Defendant's handling of Richmond's allegations qualifies as "prompt remedial action."

Finally, as to Plaintiff Swain, Defendant asserts that it took prompt remedial action upon learning in January of 1999 that two of its supervisors, Larry Carson and Jesse Higgins, had taken home and viewed a 1997 videotape of Swain and co-worker Chris Stoddard having sex. In particular, Defendant contends that Ike Growe investigated the matter, and that the two supervisors elected to resign before any official action could be taken. Stoddard also was terminated, although this was changed to a resignation through a subsequent grievance proceeding. Once again, however, the Court finds that there are issues of fact as to

whether Defendant's response was either "prompt" or "remedial."

Before even reaching this question, though, the Court initially observes that the "prompt remedial action" rubric is not wholly controlling as to Plaintiff Swain's Title VII claim arising from the videotape incident. Rather, Carson's and Higgins's status as supervisors serves to shift the burden to Defendant to prove, as an affirmative defense, that it exercised reasonable care to prevent and promptly correct the inappropriate conduct of its supervisors, and that Swain unreasonably failed to take advantage of any preventive or corrective measures or to otherwise avoid any harm.[43] The Court cannot say, and Defendant seemingly does not argue, that this affirmative defense is established as a matter of law under the present record.

Moreover, at least two factual issues pose obstacles to Defendant's claim of prompt remedial action. First, it is open to question whether Defendant might be charged with constructive notice of the videotape before January of 1999, where at least two of its supervisors, Carson and Higgins, obviously had learned of its existence by the summer of 1998, and where Swain has testified that she realized, in retrospect, that several of her co-workers evidently knew of its existence as long ago as the spring of 1997. This evidence raises an issue of fact as to whether there was such widespread knowledge of the videotape, including among the company's supervisors, that Defendant could be deemed to have constructive notice of it.[44] Next, the efficacy of Defendant's response to the dissemination of the videotape is called into question by Swain's testimony (i) that, despite Ike Growe's admonition to the workforce that they were not to talk any further about the matter, Swain was approached by several of her co-workers and asked about the outcome of the company's investigation; (ii) that, rather than granting Swain's request for vacation time until the matter had blown over, Growe instead urged Swain to

---

43. As noted earlier, because the chain of command is not made clear in the record, the Court assumes for present purposes that Higgins and Carson exercised supervisory authority over Swain during the relevant time period.

44. Of course, if Chris Stoddard's deposition testimony is believed, Swain herself played a role in the widespread knowledge about the videotape among Defendant's workforce.

accept a transfer to a lower-paying job at a different facility; (iii) that, despite the action taken against Stoddard, he was permitted to return to the plant as a painting contractor; and (iv) that Growe hugged Swain and made inappropriate personal remarks to her during follow-up meetings after her transfer. Finally, the Court already has noted the absence of evidence in the record to support Defendant's contention that Carson and Higgins were, in essence, given the choice to either resign or be terminated. Under these circumstances, the Court cannot conclude as a matter of law that Swain's claims arising from the videotape are defeated by Defendant's prompt remedial action.

### (g) The Motive Behind Daryl MacDonald's Alleged Misconduct

As its final basis for challenging Plaintiffs' sexual harassment claims, Defendant contends that certain claims asserted by Plaintiff Rhonda MacDonald must fail because the alleged acts of harassment from which they arise were not motivated by considerations of sex. Harassment is actionable under Title VII only if it is motivated by one of the impermissible considerations set forth in the statute itself—in this case, the victim's sex. *See* 42 U.S.C. § 2000e–2(a)(1); *see also Oncale,* 523 U.S. at 78–80, 118 S.Ct. at 1001–02. Michigan's Elliott–Larsen Act includes similar language requiring that actionable sexual harassment must be "because of sex." *See* Mich. Comp. Laws § 37.2103(i); *see also Chambers,* 614 N.W.2d at 915.

As Defendant points out, the courts have held that harassment motivated by personal animosity, even if this stems from a failed relationship, does not constitute discrimination "because of sex" as required to sustain a Title VII claim. *See, e.g., Succar v. Dade County School Board,* 229 F.3d 1343, 1345 (11th Cir.2000); *Galloway v. General Motors Service Parts Operations,* 78 F.3d 1164, 1168 (7th Cir.1996). In *Galloway,* for example, the Seventh Circuit affirmed the conclusion of the court below that a co-worker was not acting on the basis of sex when he called the plaintiff a "sick bitch":

> Bullock repeated "sick bitch" to Galloway some indefinite number of times over a period of four years in the context of a failed sexual relationship not contended to have been coerced or to have been otherwise an incident of sexual harassment. The repetition of the term together with the other verbal conduct that is alleged reflected and exacerbated a personal animosity arising out of the failed relationship rather than anything to do with a belief by Bullock, of which there is no evidence, that women do not belong in the work force or are not entitled to equal treatment with male employees. In these circumstances no inference could be drawn by a reasonable trier of fact that Bullock's behavior, undignified and unfriendly as it was, created a working environment in which Galloway could rationally consider herself at a disadvantage in relation to her male co-workers by virtue of being a woman.

*Galloway,* 78 F.3d at 1168 (citation omitted). The Michigan Court of Appeals, citing *Succar, supra,* and other federal decisions, recently recognized a similar principle, stating that "[w]e do not read the [Elliott–Larsen Act] to prohibit conduct based on romantic jealousy." *Barrett v. Kirtland Community College,* 245 Mich.App. 306, 628 N.W.2d 63, 74 (2001).

Defendant argues that this principle applies to Plaintiff Rhonda MacDonald's claims arising from the harassing conduct of her co-worker and estranged husband, Daryl MacDonald. However, Defendant's argument on this point is anything but well-developed; after discussing the above cases, and others, Defendant summarily states:

> Applying these cases to Rhonda MacDonald's allegations involving alleged harassment from her estranged husband, it is clear that Daryl's conduct, if true, arose out of the couple's failed relationship and not because of her status as a female at work. Accordingly, she has failed to state a claim ... of sexual harassment arising out of Daryl MacDonald's conduct.

(Defendant's Motion, Br. in Support at 15.)

This matter is less clear to the Court than to Defendant. To be sure, it appears that Rhonda MacDonald's allegations of misconduct by Daryl MacDonald relate closely in time to the point at which the couple had

separated and Rhonda had obtained a personal protection order against Daryl. Yet, it is also true that the timing of this misconduct correlates with the point, in late 1998 or early 1999, when Daryl successfully bid into a job in the machine shop, working near his estranged wife. Thus, while it might be reasonable to assume that Daryl's personal animosity toward Rhonda might have been particularly acute at the time, in light of the couple's marital difficulties, it is also possible to infer that Daryl's animosity toward Rhonda as a woman came out at this time because of his opportunity to express it. Defendant has not directed the Court's attention to any evidence that makes one scenario more or less likely than the other. Indeed, as demonstrated above, Defendant does not rest its argument on any evidence at all, but instead invites the Court to sift through the record and determine the likely motivation for Daryl MacDonald's alleged actions.

Having done so, the Court cannot say that the evidence establishes the correctness of Defendant's assertion as a matter of law. Initially, the Court notes that Rhonda MacDonald offered deposition testimony—albeit resting upon hearsay—that Daryl had referred to other women in the machine shop as "a bunch of low life snakes," and that he "pretended masturbation" toward these women. (MacDonald Dep. at 75.) More importantly, the Court cannot overlook the unquestionably sexual nature of Daryl MacDonald's alleged conduct toward Rhonda:

> He would stick his finger in his mouth and make it poke out the side of his cheek as though that was oral sex. He would grab down low and pretend that he was masturbating. He would yell to me from his machine on a daily basis, hey whore, hey fucking whore, what are you doing over there, you fucking whore. You got another one of your studs over there, you fucking whore. He would ask me if the cum is still dripping out of my pussy. Do I feel it running down my leg because I'm such a slut.

> Every time he would walk by my machine he would call me a fucking whore, a fucking slut or a fucking bitch, every single time he walked by my machine.

(MacDonald Dep. at 84.) Plainly, this conduct is a far cry from the occasional use of the phrase "sick bitch" at issue in *Galloway*.

Faced with the above testimony, a reasonable jury could conclude that Daryl MacDonald would not express his personal animosity toward, say, a male co-worker in the same fashion, and that his conduct toward Rhonda MacDonald was motivated, at least in part, by considerations of sex. *See Bowman v. Shawnee State University*, 220 F.3d 456, 464 (6th Cir.2000) (recognizing the significance of "gender-specific epithets"); *Williams*, 187 F.3d at 565–66 (same). Thus, the Court finds that issues of fact preclude an award of summary judgment to Defendant on Plaintiff Rhonda MacDonald's claims arising from the alleged conduct of Daryl MacDonald.

### 3. Plaintiffs' Claims of Retaliation

Next, Defendant seeks an award of summary judgment in its favor on Plaintiffs' Title VII and state-law claims of retaliation. To establish a prima facie case of retaliation under Title VII, a plaintiff must show: (i) that she engaged in activity protected by Title VII; (ii) that this exercise of protected rights was known to the defendant; (iii) that the defendant thereafter took adverse employment action; and (iv) that there was a causal connection between the protected activity and the adverse action. *See Hafford v. Seidner*, 183 F.3d 506, 515 (6th Cir.1999). The same elements are present in a prima facie case of retaliation under Michigan's Elliott–Larsen Act. *See DeFlaviis v. Lord & Taylor, Inc.*, 223 Mich.App. 432, 566 N.W.2d 661, 663 (1997). Each of the Plaintiffs has asserted claims of retaliation, and Defendant argues that each of these claims is lacking in evidentiary support as to one or more elements of the prima facie case.

In particular, Defendant's challenges are directed at the last two elements of this prima facie case. Regarding the "adverse action" prong of this standard, "Sixth Circuit precedents require that [the plaintiff] must have suffered a 'materially adverse' change in the terms or conditions of her employment, such as termination, demotion, decreased wages, a less distinguished title, a

material loss of benefits, or significantly diminished responsibilities." *Stone v. West*, 133 F.Supp.2d 972, 986 (E.D.Mich.2001) (citing cases). The requisite "change in employment conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Kocsis v. Multi–Care Mgmt., Inc.*, 97 F.3d 876, 886 (6th Cir.1996) (internal quotations and citation omitted); *see also Wilcoxon v. Minnesota Mining & Mfg. Co.*, 235 Mich.App. 347, 597 N.W.2d 250, 258 (1999) (applying the same standard under Michigan's Elliott–Larsen Act). Incidents of mere animosity between a plaintiff and her supervisor do not suffice, standing alone, to establish this element of a prima facie case of retaliation. *See Allen v. Michigan Dep't of Corrections*, 165 F.3d 405, 410 (6th Cir.1999); *Stone*, 133 F.Supp.2d at 986.

▪ Next, to satisfy the "causal connection" prong of a prima facie case, the plaintiff "must produce sufficient evidence from which an inference can be drawn that the adverse action would not have been taken had the plaintiff 'not' engaged in protected activity. *Allen*, 165 F.3d at 413. "Although no one factor is dispositive in establishing a causal connection, evidence that the defendant treated the plaintiff differently from identically situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation." 165 F.3d at 413. However, mere temporal proximity between the exercise of rights and an adverse action generally is not sufficient, in itself, to forge the necessary causal link. *See, e.g., Hafford v. Seidner*, 183 F.3d 506, 515 (6th Cir.1999) (two-to-five month lapse found to be only "loose temporal proximity," and hence "insufficient to create a triable issue"); *Cooper v. City of North Olmsted*, 795 F.2d 1265, 1272 (6th Cir.1986) (no causal link between filing of civil rights charge and plaintiff's discharge occurring four months later); *Parker v. Key Plastics, Inc.*, 68 F.Supp.2d 818, 833 n. 19 (E.D.Mich.1999) ("[T]his Court is aware of no case holding that proximity in time alone, without other surrounding circumstances, is

sufficient to permit" an inference of a causal connection).

Once a plaintiff makes out a prima facie case of retaliation, the defendant employer then has the opportunity, under the familiar tripartite framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), to articulate a legitimate, non-retaliatory justification for its actions. *See Harrison v. Metropolitan Gov't of Nashville & Davidson County*, 80 F.3d 1107, 1118 (6th Cir.1996); *Strouss v. Michigan Dep't of Corrections*, 75 F.Supp.2d 711, 727–28 (E.D.Mich.1999). In the event that the employer does so, the plaintiff employee must then establish by a preponderance of the evidence that her employer's proffered justification is pretextual—*i.e.*, has no basis in fact, did not actually motivate the employer's actions, or was insufficient to motivate those actions. *Strouss*, 75 F.Supp.2d at 728. Having set forth the governing legal standards, the Court now turns to the claims of retaliation in this case.

### (a) Plaintiff Patricia Marquis

▪ Plaintiff Marquis has identified a variety of instances of Defendant's alleged retaliation against her for reporting incidents of sexual harassment. First, in January of 1999,[45] Marquis was transferred from recycling to a laboratory position, and thereby lost a pay premium of $0.30 per hour she had received for driving a hi-lo, allegedly as a result of her role in the termination of co-worker Bob Soto in November of 1998. Next, after Marquis bid into a bathroom cleaning position in March of 2000, but found that the job aggravated her medical condition, she asserts that Defendant retaliated against her by refusing to approve her transfer back to the laboratory. Finally, she generally complains that she has been the subject of co-worker comments and stares for both her role in Soto's discharge and her decision to join this lawsuit.

---

**45.** To be accurate, the first instance of retaliation identified by Marquis relates to her layoff in September of 1996. This allegation, however, lies outside of the statutory period of limitation for either a Title VII or a state-law claim of retaliation, and does not satisfy the standards for a continuing violation.

Taking the last of these allegations first, Defendant points out that the Sixth Circuit has yet to decide whether co-worker retaliation is actionable under Title VII. *See, e.g., Diamond v. United States Postal Service,* 2002 WL 21995, at *5 n. 7 (6th Cir. Jan. 4, 2002); *Morris v. Oldham County Fiscal Court,* 201 F.3d 784, 791 & n. 8 (6th Cir. 2000). This Court, likewise, need not reach this issue, because such a claim of "retaliatory harassment" requires that the harassment be "severe or pervasive." *Morris,* 201 F.3d at 792. Plaintiff's vague allegations of "suspicious looks and accusations" and "people point[ing] and star[ing] at me," (Marquis Aff. at ¶ 17), do not satisfy this standard.[46]

█ Next, regarding Marquis's transfer to a laboratory position in January of 1999, the parties dispute whether this reassignment was accompanied by any materially adverse change in the terms and conditions of her employment and, if so, whether this change was causally connected to any protected activity. Although Marquis concedes that the recycling and laboratory positions were equivalent in their base rate of pay, benefits, and other tangible conditions, she points to her loss of a $0.30 per hour pay premium for hi-lo driving as the requisite "materially adverse" change in her employment. In response, Defendant has produced evidence that Marquis would have lost this pay premium even if she had remained in recycling, as the hi-lo driving portion of this job was reassigned from recycling to the employees in the "paper shed," in light of equipment purchased by Defendant which increased the speed of the tasks performed by these employees. (*See* Defendant's Reply Br., Ex. H, Keith Keller Suppl. Aff. at ¶¶ 7–10.) Defendant further states, without contradiction, that since January of 1999, no recycling employee has driven a hi-lo. (*Id.* at 12.) Thus, while the loss of a pay premium presumably constituted a "materially adverse" change in the terms of Marquis's employment, the record indicates that this change would have occurred in any event, whether or not she was transferred out of her recycling position.

Moreover, Defendant has offered a legitimate business reason for this transfer, and Marquis has failed to raise a genuine issue of fact as to this explanation. In particular, Defendant has produced the affidavit of James Sciarini, the general manager of its Tecumseh Division, who states that he ordered a reduction in the size of the recycling crew in late 1998 upon observing that "members of the recycling crew [were] wandering around the plant," seemingly without enough work to do. (Defendant's Motion, Ex. 11, Sciarini Aff. at ¶¶ 2–3.) Based on this instruction, Marquis and another employee, Davis Dickerson—who had not, so far as the record indicates, engaged in any sort of protected activity—were transferred from recycling to other jobs. Although Marquis denies Sciarini's further statement that members of the recycling crew appeared to be devoting some of their time to reading confidential documents that were designated for shredding, this denial does not call into question the legitimacy of Defendant's more general determination that the recycling crew was overstaffed. Nor, more importantly, does this factual dispute have any bearing upon the dispositive question here—namely, whether Defendant's stated basis for its decision to reassign Marquis is pretextual. The Court finds no evidence of this, and concludes, therefore, that Marquis's claim of retaliation in her transfer to a laboratory position cannot be sustained.

█ Similarly, regarding Marquis's claim of retaliation in April of 2000, when Defendant refused her request for a transfer back to a lab position, the Court again finds that this claim lacks sufficient support in the evidentiary record. First, there is nothing in the record to suggest a causal connection between this refusal and any protected activity; indeed, the very same management officials who allegedly retaliated against Mar-

---

46. To the extent that Marquis complains that her co-workers have approached her to inquire about this lawsuit, even though she "didn't think it was any of their business," (Marquis Dep. at 232), Defendant correctly points out that Plaintiffs' counsel issued a press release upon filing this action, and that Marquis was aware of this plan, (*id.* at 273). Presumably, then, Marquis should have anticipated queries from her co-workers, both because of this publicity effort by her counsel, and in light of her role as representative of a purported class of Defendant's female employees.

quis in this instance presumably approved Marquis's request for a transfer to a bathroom cleaning position just a few weeks earlier, in March of 2000. Neither is there much in the way of temporal proximity between Defendant's denial of a transfer in April of 2000 and Marquis's most recent exercise of protected activity, her filing of this suit in December of 1999. In addition, while Marquis presumably would point to the aggravation of her back condition as the materially adverse consequence of Defendant's denial, she did not provide management with any documentation in support of any claimed medical restrictions that precluded her from continuing to perform the bathroom cleaning job—a job which she herself had sought just a few weeks earlier.

Even assuming that Marquis could make out a prima facie case as to this claim of retaliation, she has not produced any evidence that Defendant's stated basis for denying her requested transfer is pretextual. Defendant states, without contradiction, that the bathroom cleaning position held by Marquis was a "regular," unrestricted job, while the laboratory position she sought in April of 2000 was a light-duty, "make work" job. Defendant then asserts that Marquis's request was denied because she sought transfer from a "regular" to a "make work" job, against Defendant's purported practice, and because she had "bumped" another employee to obtain her current job just a few weeks earlier, and therefore, under the union contract, could not "bump" into another job for six months. In response, Marquis contends that the lab position she sought was vacant, so that there was no need to "bump" into this job, and she also cites other employees who allegedly have been permitted to move from one job to another within less than 6 months. Finally, Marquis states that she has "never heard of" Defendant's prohibition against transfers from "regular" to "make work" positions, particularly in the case of "restricted

employees who need to find jobs tailored to their needs." (Marquis Aff. at ¶ 23.)

As to the first of these responses, however, Marquis's evidence is hopelessly contradictory, and cannot serve to raise a genuine issue of fact. She states in her affidavit that the laboratory position she sought was "vacant," (*id.* at ¶ 23), yet she testified at her deposition that another employee had replaced her when she transferred out of this job just a few weeks earlier, and that this replacement worker was merely "on vacation" when she sought to return to the lab. (Marquis Dep. at 385, 389.) Thus, the requested transfer necessarily would have required that another employee be bumped, or else this reassignment would have been of very limited duration. The former would have violated the union contract, and the latter, according to Defendant, would have been contrary to its usual practice. Plainly, Marquis cannot raise an issue of fact merely by stating that she had "never heard of" this practice, and her appeal to the unfair impact of this practice upon restricted employees is equally unavailing, where she had just been placed in an unrestricted position at her own request, and where she produced no documentation at the time to indicate that she should be placed back into a restricted position.[47] Finally, as to the employees identified by Marquis who were permitted to change jobs more frequently than once every six months, Defendant answers, again without contradiction in the record, that these cases all involved transfers from one "make work" job to another,[48] and thus did not implicate the prohibition against reassignment from "regular" to "make work" positions. Accordingly, this claim of retaliation, like the others asserted by Marquis, is lacking in evidentiary support, and therefore fails as a matter of law.

### (b) Plaintiff Annette Richmond

Plaintiff Richmond has identified three instances of allegedly retaliatory treatment, all related to her complaints of co-

---

**47.** In fact, just a short time later, in June of 2000, an unrestricted job became available in Defendant's payroll office, and Marquis successfully bid into this position.

**48.** Marquis acknowledged at her deposition that Defendant's practice with respect to "make work" positions was fairly informal, with employees permitted to move among these jobs without having to bid on them. (Marquis Dep. at 41.)

worker sexual harassment in July of 1999.[49] First, she claims that, on the very day she made these complaints, she was given a five-day suspension on the pretext of poor attendance. Next, Richmond alleges that her co-workers responded with retaliatory harassment upon learning that she had complained about their conduct. Finally, she asserts that she was constructively discharged by virtue of Defendant's failure to take appropriate action in response to her co-workers' inappropriate conduct.

Regarding Richmond's five-day suspension in July of 1999, Defendant argues (i) that there is no causal connection between this disciplinary measure and Richmond's complaints of co-worker harassment, where the suspension purportedly preceded the complaints; and (ii) that, in any event, Richmond has not offered evidence that Defendant's stated reason for the suspension, poor attendance, is pretextual. On the first of these arguments, the Court finds that the record does not permit a determination as a matter of law, where it appears that Richmond complained on more than one occasion, and that at least one of these complaints might well have preceded her suspension. As to Defendant's second argument, however, the Court agrees that the record is devoid of any evidence that might in any way contradict or cast doubt on Defendant's stated reason for Richmond's suspension as based on her violation of the attendance policy set forth in the collective bargaining agreement. Although the close temporal proximity between Richmond's complaint and the suspension might suffice to establish a prima facie case of retaliation, this evidence of proximity, standing alone, cannot satisfy Richmond's burden of showing that Defendant's stated, legitimate basis for its action is a mere pretext for retaliation.

Richmond's remaining claims of co-worker retaliatory harassment and constructive discharge are somewhat related, both in their underlying facts and in their legal elements, as they require similar showings of "severe or pervasive" harassment, as to the former claim, see Morris, 201 F.3d at 792,[50] or significantly degraded working conditions, as to the latter, see Bowman v. Shawnee State University, 220 F.3d 456, 462 n. 6 (6th Cir. 2000); Champion v. Nationwide Security, Inc., 450 Mich. 702, 545 N.W.2d 596, 600 (1996) (explaining that a constructive discharge occurs only where the employer's conduct "is so severe that a reasonable person in the employee's place would feel compelled to resign"). Although Defendant argues that the alleged conduct of Richmond's co-workers was not sufficiently severe or pervasive to satisfy either standard, the Court declines to so hold as a matter of law, where Richmond has testified that her co-workers responded to her complaints of harassment by "running their mouths," calling her a "crybaby," and throwing a bolt at her, which bruised her face, (Richmond Dep. at 156–57), and where these were merely the latest examples of an ongoing pattern of alleged harassment by the same three co-workers.

Defendant next contends that it took appropriate remedial action in response to the complaints brought to its attention by Richmond, and that it lacked notice at the time of

---

**49.** Again, to be accurate, Richmond also has raised an allegation of retaliation in 1998, when she purportedly was given a disciplinary layoff in response to a complaint of co-worker harassment. This claim, however, lies outside the Title VII period of limitation, and is not saved by a continuing violation theory. Moreover, Richmond failed to exhaust her administrative remedies as to this complaint, since it is nowhere mentioned in her EEOC charge, and is wholly unrelated to the claims she did assert. Indeed, the Court's exhaustive review of Richmond's entire 205–page deposition has revealed only the most fleeting (and vague) of references to this incident. (See Richmond Dep. at 71.) Moreover, the record (such as it is) suggests that the underlying co-worker harassment was race-based, but Richmond did not allege race discrimination in her EEOC charge.

In any event, Richmond would be unable to establish the requisite causal connection with respect to this claim of retaliation. The underlying complaint of co-worker harassment was made in November of 1998. Yet, contrary to the statement in Plaintiffs' brief that Richmond was laid off "[o]ne or two days later," (Plaintiffs' Response at 80), her employment record reflects that her next disciplinary layoff did not occur until several months later, in July of 1999.

**50.** This assumes, as discussed earlier, that a claim of co-worker retaliatory harassment is sustainable under either Title VII or Michigan's Elliott–Larsen Act.

any additional complaints. Again, however, the Court finds that this argument rests upon an unduly compartmentalized reading of the evidence. The record reflects a number of complaints, meetings, interviews, and investigations by management regarding Richmond's various run-ins with her three co-workers. Under these circumstances, the Court cannot conclude as a matter of law that, for example, Richmond's statement to supervisor Ray Martinez that her co-workers were "throwing stuff at me," (Richmond Dep. at 157), was insufficient to place Defendant on notice of the bolt-throwing incident. Neither can the Court agree that Defendant's remediating measures were adequate as a matter of law, where there is evidence that the harassment of Richmond by her co-workers continued unabated after management warned all four employees to cease their inappropriate conduct.

Finally, Defendant points to a purported temporal difficulty in Richmond's claim of constructive discharge. Specifically, Defendant notes that Richmond had applied for a new job at Jackson Automotive on June 18, 1999, and that she apparently filed out some employment materials for this new job, including a W-4 form, on August 7, 1999. Accordingly, Defendant contends that it was this new, higher paying job, rather than any degradation in her working conditions, that caused Richmond to resign her employment with Defendant effective September 22, 1999. Further, Defendant submits that Richmond's unhappiness with management's decision to merely warn her and her three co-workers could not have played a role in her decision to resign, where the warnings were given on August 25, 1999 but, as noted, there is some indication that Richmond might have already accepted her new job in early August.

Again, the Court finds that Defendant's reading of the record, while plausible, is not the only permissible view of the evidence. First, Richmond's claim of constructive discharge plainly is not defeated solely by virtue of her efforts at finding another job in mid-June, particularly where Richmond's deposition testimony seems to indicate that her run-ins with her co-workers began a few days earlier, and that she almost immediately

reported this co-worker harassment to her supervisor, Dave Soto, who "laughed it off." (Richmond Dep. at 129–31.) Next, the evidence as to when Richmond actually accepted her new job is somewhat mixed, where she did fill out some paperwork in early August, but where she testified at her deposition that the hours initially offered by this new employer were not acceptable, and that this new job was hers only "[i]f I wanted it." (*Id.* at 163.) Thus, the Court cannot conclude here, as it has elsewhere with respect to Plaintiffs' various post-deposition, post-summary-judgment affidavits, that Richmond has contradicted or unduly sought to fill non-existent "gaps" in her deposition testimony by claiming in her affidavit that she accepted the new job only while on vacation from her position with Defendant in September of 1999. More generally, as discussed earlier, the Court is unable to say under the present record, with its numerous instances of alleged harassment, complaints, meetings, and investigations, that Richmond's efforts to obtain a new job were not, as a matter of law, attributable in some part to retaliation she allegedly suffered on her job with Defendant. The Court, therefore, declines to grant summary judgment to Defendant on these latter two of Plaintiff Richmond's several claims of retaliation.

### (c) Plaintiff Erika Swain

██ Although the record is anything but clear on this point, Plaintiff Swain apparently has asserted four claims of retaliation: (i) that, because of Defendant's inadequate response to the videotape incident, she was forced to take a lower-paying job at Defendant's Clinton facility; (ii) that, in January and February of 2000, after this suit was filed, she was twice denied opportunities to work overtime; (iii) that Defendant improperly imposed two disciplinary layoffs in February and March of 2000, on the pretext of attendance policy and mandatory overtime violations; and (iv) that she was constructively discharged in April of 2000 when Defendant improperly denied her request for personal leave time, and instead insisted that she must obtain a physician's note confirming

her eligibility for a leave under the Family and Medical Leave Act ("FMLA").[51]

On the first of these claims, Defendant argues, and the Court agrees, that the evidence fails to bear out Swain's contention that she was reassigned to a job with lower pay. Swain's own affidavit indicates that she requested time off in January of 1999 to avoid the comments of her co-workers regarding the videotape incident,[52] but that Defendant instead suggested that she could transfer from the main plant to the Clinton facility. Swain initially resisted this offer, citing the lower pay for the Clinton position, but Defendant's management promised to match her pay on the hi-side line, at least for the time being. Swain remained in a temporary position at the Clinton facility for about ten days, and then voluntarily bid on a permanent position there, assuming this job on February 1, 1999.[53] Defendant has produced payroll records revealing that Swain's weekly pay for the Clinton jobs in late January and early February of 1999 exceeded her weekly pay in early January of 1999 for her job in the main plant. If Swain truly had suffered a pay decrease, it should have been an easy matter to document this allegedly adverse impact. In fact, the record evidence demonstrates precisely the opposite.

In any event, Defendant has identified a legitimate, non-retaliatory basis for the transfer, and Swain has offered no evidence that this stated reason is pretextual. Specifically, Defendant asserts, without contradiction, that Swain was reassigned to the Clinton facility in response to her complaints of an unpleasant work environment at the main plant in the aftermath of the videotape incident. To be sure, Swain now suggests that Defendant could have handled things differently, taking more decisive action against those involved in the videotape incident and sending a more forceful message that Swain's co-workers were not to discuss the matter any further. Swain further contends that, if such measures had been taken, she would not have felt compelled to accept a job at a different facility. Be that as it may, none of this calls into question Defendant's stated basis for its actions—to say that Defendant could have done better does not give rise to an inference that its actions were designed to retaliate against Swain's exercise of protected activity. Rather, as discussed earlier, Swain's arguments bear only upon the distinct question whether Defendant took prompt remedial action upon learning of the videotape incident.

Likewise, Defendant has advanced legitimate reasons for its actions in twice denying Swain the opportunity to work overtime in early 2000, and Swain has failed to produce evidence challenging these reasons. Swain testified that, on one occasion, her regular supervisor was away and a substitute supervisor "overlooked" her when assigning overtime work, an action she concedes "[m]ight have been just a mistake." (Swain Dep. at 11–12.) The other occasion presented the "same type of situation"—Swain's regular supervisor "wasn't there, I was not asked," and

---

**51.** This list omits Swain's assertion that Larry Carson retaliated against her in 1997 when she confronted him about his inappropriate comments, as this claim lies outside the Title VII period of limitation, and also falls outside the scope of Swain's EEOC charge. Indeed, Swain did not even check the "retaliation" box on the EEOC form, and this charge can fairly be read as alleging that Swain's transfer to the Clinton facility in January of 1999 was not retaliatory, but instead was an inadequate response to her complaints of sexual harassment. Moreover, apart from the question, noted earlier, whether Carson was Swain's supervisor at the time, there is no evidence of any materially adverse consequence to Carson's alleged retaliation, where Swain testified that Carson's interactions with her became more negative and dwelled upon defects in her job performance, (*see* Swain Dep. at 452–54), but where she did not identify any materially adverse

impact, such as disciplinary action or a decrease in pay or benefits, as a result of this change in her relationship with Carson.

**52.** Defendant suggests that Swain's account of co-worker harassment is not credible, since she was off work for various reasons during the entire period between the date she allegedly learned of and complained about the videotape, January 7, 1999, until the date she returned to work and was reassigned to the Clinton facility, January 18, 1999.

**53.** Defendant further notes that Swain voluntarily bid on a different position at the Clinton facility in June of 1999, and that she never has sought to move back to an allegedly higher-paying job in the main plant, despite periodic job openings at this plant.

overtime was instead assigned to another employee with less seniority. (*Id.* at 12.) Swain subsequently filed a grievance as to these incidents, and her regular supervisor explained during these proceedings that the overtime was given to the employee who had already been performing, during the regular work period, the job for which overtime was needed. Although this decision, in Swain's view, violated the collective bargaining agreement, she stated at her deposition that her supervisor had "utter disregard for contract rules" and engaged in this sort of practice "commonly," toward both Swain and other employees. (*Id.* at 12–13.) This testimony not only fails to establish pretext, but instead indicates just the opposite—namely, that Swain was treated no differently from other employees.

Regarding Swain's challenges to her disciplinary layoffs in February and March of 2000, the Court reaches the same conclusion, albeit on slightly different grounds. Swain does not contest the factual bases for the measures ultimately imposed by Defendant. Specifically, regarding her 5–day layoff in February, Swain has testified that she produced only a single doctor's note for her absences in the 30–day period up to February 15. Yet, this doctor's note covers only three of the eight days she missed during this period, and Defendant states, without contradiction, that the collective bargaining agreement calls for a 5–day layoff for absences in excess of three in a 30–day period. Next, the 30–day suspension in March was a second-step disciplinary measure, following the 5–day layoff in February, and was based on Swain's failure to work overtime during the week of March 20, as her supervisor maintained she had agreed to do. Again, Swain does not dispute that she worked overtime only one day that week, and not the remaining days.[54] Rather, she merely takes

issue with her supervisor's belief that she had agreed to work overtime for the entire week. Such divergent understandings alone cannot establish pretext, absent substantiation of Swain's bare assertion that her supervisor could not have honestly held this belief. *See Mitchell v. Toledo Hospital,* 964 F.2d 577, 585 (6th Cir.1992) (holding that a "plaintiff's denial of the defendant's articulated legitimate reason without producing substantiation for the denial is insufficient" to show pretext); *Parker,* 68 F.Supp.2d at 829–30.

Nonetheless, Swain contends that the legitimate explanations offered by Defendant did not, in fact, motivate its actions. First, regarding her 5–day suspension, she points to inconsistencies in the record as to Defendant's actual reason for imposing this layoff. Defendant states that the suspension initially was indefinite in length, and was based on Swain's purported violation of the "no call, no show" rule by allegedly failing to call her supervisor to report her three absences in mid-February.[55] In contrast, Swain contends that management told her at the time that the suspension was based on her alleged failure to provide documentation for her absences in January—documentation which, according to Swain, she provided but Defendant lost—and that the absences in February were not mentioned. This purported inconsistency is unavailing, however, because Swain has not produced any evidence that the outcome would have been any different, in light of her acknowledged violation of Defendant's attendance policy. Even assuming, then, that management's purportedly changing stories and "runaround" could support an inference of retaliation, Swain has failed to identify any adverse impact from this alleged retaliation.

Swain next challenges Defendant's stated reasons for her two suspensions by arguing that Defendant overlooked her similar viola-

---

54. Defendant further asserts that Swain had three more absences in the prior 30–day period, providing an independent basis for the 30–day suspension.

55. Swain testified that her husband called in for her, and that she later left a voice mail for her supervisor reporting her absence. Defendant states that it ultimately reduced Swain's indefinite suspension to a 5–day layoff because, while

Swain's own supervisor apparently had a rule against letting family members call in absences on an employee's behalf, other supervisors had not adopted such a rule. Thus, Swain was suspended solely on the basis of her three absences within a 30–day period. Because she already had missed eight days of work by the time the company reduced its penalty, she was awarded three days of pay.

tions before this lawsuit was filed, and that Defendant has treated others differently despite the same or similar violations. In response, Defendant argues, and the Court agrees, that Swain has not produced any evidence of truly comparable situations that were handled differently. Regarding Swain's comparison with her own pre-litigation conduct, Defendant points out that it did, in fact, attempt to impose a 5–day suspension for Swain's prior violation of its attendance policy in November of 1999, before this action was filed, but that the discipline was withdrawn because a union representative was not present when this penalty was determined. Defendant also has produced evidence that other pre-suit absences were not "ignored," but instead were covered by the FMLA, and therefore could not be counted as violations of the company's attendance policy. Next, regarding Swain's attempted comparison with co-worker Veda Perry regarding attendance violations, Defendant correctly notes that Perry reported to a different supervisor, and therefore is not "similarly situated" for purposes of showing pretext. *See Braithwaite v. Timken Co.,* 258 F.3d 488, 497 (6th Cir.2001); *Mitchell,* 964 F.2d at 583.

Finally, the Court rejects Swain's claim of constructive discharge as wholly without merit. Apart from her claims of retaliatory disciplinary measures—claims which the Court has found lack evidentiary support—Swain has not identified any events that occurred at or around the time of her resignation in late April of 2000 that might have made her working conditions unbearable, such that a reasonable person in her position would have felt compelled to resign. Moreover, to the extent that Swain asserts that Defendant acted with retaliatory motives in denying her request for personal leave in lieu of her resignation, and instead advising her that the FMLA provided the only avenue for obtaining such leave, the Court notes Swain's testimony that she contacted Defendant at the time and stated that she "couldn't function," to which Defendant's representative responded that she might be eligible for FMLA leave if she could obtain supporting documentation from a physician. (Swain

Dep. at 351–52.) [56] This testimony suggests, at most, that Defendant perhaps could have provided further assistance in identifying means for Swain to obtain a temporary leave and eventually return to work. As explained earlier, such a failure to suggest alternatives does not suffice to cast doubt upon Defendant's stated reasons for acting as it did.

### (d) Plaintiff Lisa Davis

■ Plaintiff Davis has raised two claims of retaliation, both arising after this lawsuit was filed. First, she claims that, on one occasion in early 2000, her supervisor sent her home early when half of the line on which she worked had been shut down, despite the practice under her prior supervisor to allow her to remain and work the other half of the line. Second, she alleges that, in September of 2000, she was initially (though not ultimately) denied FMLA leave to remain at home for additional time following the birth of her child. The Court finds that neither of these claims survives summary judgment.

First, regarding the single occasion when Davis was sent home early, the Court first observes that the presumably *de minimis* impact of this action might well fail to qualify as "materially adverse" under the third prong of a prima facie case of retaliation. Moreover, there is no evidence of a causal connection between Davis's exercise of protected activity and the action of her supervisor, where this supervisor, Ben Spence, had only been with the company for a short time, and has stated that he was unaware at the time of this lawsuit or Davis's involvement in it. Davis herself testified that she did not "know if [Spence] does know I'm part of the lawsuit," and she acknowledged that she is only guessing that Spence acted with retaliatory motives. (Davis Dep. at 234, 243.) In any event, Spence has offered a legitimate reason for his action—namely, that with half of the line shut down, there would have been only about two minutes of work for Davis to perform over the remainder of the day, (*see* Defendant's Motion, Ex. 15, Spence Aff. at

---

**56.** Swain further testified that she owed her doctor money and could not afford to pay him, so that she was unable to seek a doctor's note in support of a request for FMLA leave.

¶ 7)—and Davis's testimony that her prior supervisor handled the situation differently does not in any way tend to convert Spence's business judgment into a pretext for retaliation.

 ▮ Likewise, Davis's allegation of a retaliatory denial of FMLA leave fails for lack of evidence of either a materially adverse impact or a pretextual justification. Although a clerk apparently told Davis, incorrectly, that she was ineligible for this leave, Defendant discovered this error before Davis had returned to work, and her leave continued uninterrupted.[57] In addition, Davis again has no evidence that the human resources employees who initially denied her leave request acted with retaliatory motives, as opposed to making an administrative error as they have testified. Davis conceded at her deposition that it was only "a guess" that these individuals sought to retaliate against her exercise of protected activity, and that, so far as she knew, these employees actually might support this lawsuit. (Davis Dep. at 241, 243.)

### (e) Plaintiff Rhonda MacDonald

Plaintiff MacDonald has asserted two claims of retaliation in this case: (i) that Defendant unlawfully took action against her, rather than her estranged husband, in addressing the couple's various confrontations on the job in the machine shop; and (ii) that she was constructively discharged in the spring of 2000 when her supervisor at the time, Mark Jenkins, made remarks that threatened her life and seemed designed to scare her.[58] The Court finds, however, that MacDonald has failed to make out a prima facie case with respect to either of these claims of retaliation.

Regarding MacDonald's claim arising from her transfer in response to the alleged sexual harassment of her by her estranged husband Daryl, MacDonald's own deposition testimony contradicts her claim that this transfer was retaliatory in nature. Specifically, she testified that her supervisor asked her to voluntarily transfer to another position, based on his purported concern that the department would be "dead in the water" without Daryl, because he did not "have anybody else to run those grinders." (MacDonald Dep. at 114.) Apparently, then, MacDonald herself did not believe that Defendant was motivated by retaliatory considerations, but rather by a judgment (albeit one MacDonald disagrees with) as to the company's business needs. In addition, as Defendant points out, there does not appear to be any evidence of protected activity that could be causally linked to MacDonald's transfer, as the company took action based on the reports of others, and not MacDonald, that she and Daryl were arguing on the job. This events surrounding this transfer, then, while certainly bearing upon the question whether Defendant took appropriate remedial action in response to Daryl's alleged harassment, do not suffice to establish a prima facie case of retaliation.

Next, MacDonald's claim of retaliation by supervisor Mark Jenkins fails for lack of cognizable evidence that Jenkins was even aware of MacDonald's participation in this lawsuit, or of any other protected activity in which she had engaged. MacDonald conceded at her deposition that she had no personal knowledge as to whether Jenkins was aware of her involvement in this suit,

---

57. According to Defendant, Davis's initial leave after childbirth was incorrectly designated as FMLA rather than medical leave, thereby exhausting her FMLA leave time more quickly. When this error was corrected, it was determined that there was enough remaining FMLA leave time to honor Davis's request.

58. MacDonald's most recent affidavit raises two additional such allegations. First, she asserts that she received her first-ever disciplinary layoff within weeks after this action was filed. However, because she never before raised such a claim, at her deposition or otherwise, the Court declines to consider it. Next, MacDonald claims that her supervisor engaged in more watchful and intimidating conduct after this suit was filed. Yet, she has produced no evidence of any materially adverse effect of this conduct, nor does the record support a finding of severe or pervasive retaliatory harassment. In any event, MacDonald's affidavit contradicts her deposition testimony on this point, as she testified at her deposition that this supervisor "hound[ed] me" from the time she began to work in the machine shop, and throughout her entire time on that job. (MacDonald Dep. at 187–89.)

that she never discussed the matter with him, and that Jenkins himself never mentioned anything about a lawsuit to her. (*See* MacDonald Dep. at 153–54.) Her sole basis for believing that Jenkins's actions were retaliatory is the statement of a co-worker named "Jerry"that Jenkins was, in fact, aware that MacDonald was participating in this suit. (*Id.* at 153–54.) The Court, however, cannot rely on such inadmissible hearsay offered in opposition to Defendant's motion for summary judgment. *See Parker,* 68 F.Supp.2d at 831. At any rate, it is doubtful whether Jenkins's remarks to MacDonald on two occasions, while admittedly bizarre, could be deemed to have made MacDonald's working conditions so unbearable that she felt compelled to resign. In this regard, it is noteworthy that MacDonald did not report Jenkins's comments to higher management or the union, but instead cited "personal reasons" as the basis for her resignation. (MacDonald Dep. at 151, 155.)

### (f) Plaintiff Karin Conrad

Finally, Plaintiff Conrad has asserted three claims of retaliation: (i) that, after she was assigned to the Orbitec facility in January of 2000, her supervisor, Gene Clark, sucked his thumb in front of her during her first couple of days on the job, which she took as a reference to her participation in this. suit; (ii) that she was not given a permanent pass key to the Orbitec facility for the first several months she worked there, but instead had to obtain a temporary pass each day; and (iii) that, on several occasions, she was verbally reprimanded for talking to co-workers, while other employees were not reprimanded for similar conduct.

, Defendant responds, and the Court agrees, that Conrad has failed to establish the "adverse action" prong of her prima facie case as to any of these claims of retaliation, where Conrad has not identified any "materially adverse" change in the terms or conditions of her employment as a result of these alleged instances of retaliation. For example, during her time in the Orbitec facility, Conrad has never been written up, given a disciplinary layoff, or otherwise subjected to formal discipline of any sort. Nor has Conrad produced

evidence of "severe or pervasive" mistreatment that might support a claim of retaliatory harassment. She also has offered nothing beyond her own unsupported beliefs that might link any of her claims of Defendant's misconduct to her exercise of protected activity.

Finally, regarding the denial of a permanent pass key—the claim which, in the Court's view, presents the closest question as to a "materially adverse" effect—Conrad has not offered any evidence, but only speculation and inadmissible hearsay, that might tend to cast doubt upon Defendant's legitimate explanation for its action. In particular, Defendant states that Conrad's position at the facility was temporary, and that temporary employees are given temporary keys. Conrad does not deny, and in fact acknowledged at her deposition, that she held a light-duty temporary position at Orbitec. Although Conrad argues that other, purportedly comparable employees were given permanent keys, the admissible evidence she offers on this point fails to establish that she and these other employees were similarly situated in all relevant respects.

### 4. Plaintiffs' Claims of Intentional Infliction of Emotional Distress

As noted at the outset, each of the Plaintiffs has asserted a state-law claim of intentional infliction of emotional distress. As the final ground of its several motions, Defendant argues that it should be awarded summary judgment in its favor on these claims, primarily because Plaintiffs have failed to identify any "extreme or outrageous" conduct for which the company may be charged with liability. The Court agrees.

Under Michigan law, there are four elements to a claim of intentional infliction of emotional distress: (1) extreme and outrageous conduct; (2) intent or recklessness; (3) causation; and (4) severe emotional distress. *See Hartleip v. McNeilab, Inc.,* 83 F.3d 767, 777 ( 6th Cir.1996); *Plumb v. Abbott Laboratories,* 60 F.Supp.2d 642, 654 (E.D.Mich.1999). "Liability may be found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decen-

cy, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Hartleip,* 83 F.3d at 777 (internal quotations and citations omitted).

As a matter of law, the Court finds no evidence of such "extreme and outrageous" conduct in this case. Indeed, it appears that Plaintiffs might well have abandoned these claims, as their consolidated response to Defendant's motions fails to address the company's contention on this point. Moreover, Defendant correctly points out that, under Michigan law, it cannot be held vicariously liable for any intentional torts committed by its employees beyond the scope of their employment. *See Selph v. Gottlieb's Financial Servs., Inc.,* 35 F.Supp.2d 564, 569 (W.D.Mich.1999). The Michigan Supreme Court has observed that hostile work environment claims generally involve actions taken outside the scope of the harassing employee's authority, *see Chambers,* 614 N.W.2d at 916, and the record in this case largely comports with this observation, particularly as to the more severe instances of sexual harassment alleged by Plaintiffs. For these reasons, then, the Court finds that Defendant is entitled to summary judgment in its favor on Plaintiffs' state-law claims of intentional infliction of emotional distress.

## IV. CONCLUSION

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Plaintiffs' December 1, 2000 Motion for Class Certification is DENIED. In light of this ruling, IT IS FURTHER ORDERED that Plaintiffs' December 26, 2000 Motion to Bifurcate Trial is DENIED AS MOOT.

Next, IT IS FURTHER ORDERED that Defendant's November 30, 2000 Motions for Summary Judgment as to Plaintiffs Davis and Conrad are GRANTED, and that its November 30, 2000 Motions for Summary Judgment as to the remaining four Plaintiffs are GRANTED IN PART and DENIED IN

**59.** The Court will soon be issuing a notice rescheduling the final pretrial conference in this case, and setting a deadline for the parties to submit their proposed joint final pretrial order.

PART, in accordance with the rulings set forth in this Opinion and Order.[59]

In this proposed order, counsel should set forth the claims that remain in light of this Opinion and Order. Counsel also should be prepared to address this issue at the final pretrial conference.